Shalom Jacob
Alan H. Katz
LOCKE LORD LLP
3 World Financial Center
New York, New York 10281
Telephone:    (212) 415-8618
Facsimile:    (212) 812-8370

**Hearing Date and Time:  September 16, 2014 at 10:00 a.m. EDT**
**Response Deadline:  September 9, 2014 at 4:00 p.m. EDT**

Counsel to Barkany Asset Recovery and Management LLC

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

In re:

  GERSHON BARKANY,

        Alleged Debtor.

Case No. 8-14-72941-las

Chapter 7

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR ORDER DISMISSING CASE PURSUANT TO**
**11 U.S.C. §§ 105(a), 303(b), 305(a) AND 707(a)**

TO  THE  HONORABLE  LOUIS  A.  SCARCELLA,  UNITED  STATES  BANKRUPTCY
JUDGE:

        BARKANY ASSET RECOVERY AND MANAGEMENT LLC ("BARM") respectfully

submits this memorandum in support of its motion (the "Motion") seeking dismissal of this case.

Attached to the Motion are Declarations of S. David Belsky (the "Belsky Declaration") and Alan

H. Katz (the "Katz Declaration") containing factual and documentary support for the Motion.

**PRELIMINARY STATEMENT**

        BARM seeks dismissal of this case pursuant to Sections 105(a), 303(b), 305(a) and

707(a) of the Bankruptcy Code.  The alleged debtor, Gershon Barkany ("Barkany"), also seeks

dismissal. On August 13, 2014, he filed a motion seeking dismissal pursuant to Sections 303(b) and 305(a). (Doc. No. 13.)

The filing of an involuntary petition is an extraordinary remedy that may be used solely by creditors whose claims are not subject to bona fide dispute and only where bankruptcy relief will serve some appropriate bankruptcy purpose.

In this case, it is evident that the Petitioners' primary, if not sole, purpose in filing the involuntary petition against Barkany was to obstruct the lawsuits commenced against each of the Petitioners only weeks earlier by bona fide creditors who hold a $66 million judgment against Barkany (the "Judgment Creditors"). These lawsuits, in which each of the Petitioners is named as a defendant, seek to recover millions of dollars for fraudulent transfers, aiding and abetting Barkany's massive fraud against the Judgment Creditors and other improper conduct which continued for years even after Barkany publicly admitted to committing a Ponzi scheme. As a result of the involuntary petition, the Petitioners have successfully obtained a stay of these actions at least as to Barkany.

As demonstrated herein, the case law is clear that an involuntary petition that has been filed as a litigation tactic is deemed to be filed in bad faith and must be dismissed. The identity of the Petitioners – Barkany's father-in-law and his close business associate who aided Barkany's commission of his fraud and the casino at which Barkany gambled away millions of creditor dollars – speaks volumes as to their motivation in filing the petition.

Although the Petitioners' filing of the involuntary petition in bad faith is a more than sufficient basis for its dismissal, dismissal is also warranted because the Petitioners are not holders of claims that are not the subject of a bona fide dispute and therefore lack standing to file a petition against Barkany. Since December 2010, the Judgment Creditors' forensic accountant,

Mr. Belsky, has been conducting an investigation regarding Barkany's Ponzi scheme and the disappearance of many millions of dollars lost by the Judgment Creditors. As explained in detail in the Belsky Declaration, the notion that the Petitioners are owed money by Barkany is clearly contradicted by the relevant facts and records and the Petitioners' failure to assert any claim against Barkany until the Judgment Creditors took legal action against each of them. Indeed, set forth in detail in the Judgment Creditors' lawsuits, the Petitioners received approximately ten million dollars from Barkany and his entities. The Petitioners do not deny that they received these funds but now claim they are still owed even more money.

In addition, even if the Petitioners at one point had claims against Barkany, after Barkany acknowledged his fraud in 2010, he made substantial additional payments to each of the Petitioners well in excess of the claimed amounts. Even if Barkany was at some point indebted to the Petitioners, their claims have been fully satisfied. Accordingly, the Petitioners are not creditors of Barkany.

Finally, as demonstrated herein, pursuant to Section 305(a) and 707(a) of the Bankruptcy Code, dismissal is warranted for cause and because it is in the best interests of Barkany and his creditors.

## **BACKGROUND**

1. The alleged debtor, Barkany, pleaded guilty in June 2013 to wire fraud and is awaiting sentencing.[1] Since his arrest, Joseph Rosenberg ("Rosenberg"), who is Barkany's father-in-law, has been supporting Barkany and his family. Mr. Rosenberg's support has included the payment of $250,000.00 to Barkany's criminal defense attorney and payment of additional fees to other lawyers representing Barkany. Mr. Rosenberg also arranged Barkany's

---

[1] See Katz Declaration, Exhibits "C," "D" and "E." Barkany was arrested in March 2013.

bail package, under which Mr. Rosenberg and other relatives provided a $2,000,000.00 bond secured by a lien on family real estate.

2.      From 2008 through at least November 2010, Barkany and legal entities organized and controlled by him (the "Barkany Entities") conducted a Ponzi scheme by which approximately $60,000,000.00 was stolen from the Judgment Creditors, a group of victims represented by undersigned counsel.   In November 2010, Barkany acknowledged to the Judgment Creditors that he committed a Ponzi scheme and pledged to cooperate fully with the Judgment Creditors' efforts to recover their.  He has since claimed to have turned over all of his remaining assets.

3.      Soon after discovery of the fraud, the Judgment Creditors retained Locke Lord LLP as legal counsel in connection with the fraud perpetrated by Barkany and the Barkany Entities.   Locke Lord LLP retained S. David Belsky ("Mr. Belsky"), a Certified Public Accountant who is also a Certified Fraud Examiner and is certified in financial forensics, to investigate Barkany's fraud and financial transactions.

4.      In December 2010, Locke Lord LLP organized BARM to assist in the recovery, collection and administration of assets stolen by Barkany.  Mr. Belsky as representative of the victims serves as BARM's sole member and manager.  Mr. Belsky has no pecuniary interest in BARM.

5.      In August 2011, Barkany executed an Affidavit of Confession of Judgment, which was used in March 2013 to obtain a $66,609,424.74 Judgment in favor of the Judgment Creditors and against Barkany and numerous Barkany Entities.[2]  The Judgment was assigned to

---

[2] Katz Declaration, Exhibit "A."

BARM in August 2013.[3]   Additionally, Barkany and the Barkany Entities assigned loans receivable and various other assets to BARM.[4]

6.     In the course of Mr. Belsky's investigation, he determined that Mr. Rosenberg, Marina District Development Co., LLC, the licensee of the Borgata Hotel Casino and Spa in Atlantic City, New Jersey ("MDDC"), and Saul Kessler ("Kessler", and together with Mr. Rosenberg and MDDC, the "Petitioners") had, collectively, received in excess of $10,000,000.00 from Barkany and the Barkany Entities.

7.     When BARM attempted to obtain information from each of these parties about their financial transactions with Barkany and the Barkany Entities, they received the following "responses":

> (i)     In response to a subpoena duces tecum served on May 9, 2013, Mr. Rosenberg provided BARM with largely unusable, gap-filled, heavily redacted documents which do not support his being owed anything at all.  He has not responded to requests for additional information.

---

3 Katz Declaration, Exhibit "B."

4 Commencing in 2011, the Judgment Creditors and later BARM began filing lawsuits to recover fraudulent transfers made by Barkany and the Barkany Entities and to assert independent liability of persons who aided and abetted the Ponzi schemes.  Lawsuits have been brought against recipients of allegedly charitable donations, against investors who received payments ranging in some cases into millions of dollars, against Barkany's sister and brother-in-law to whom he gave at least $525,000.00 to help them acquire and renovate a residence in Israel, and against persons to whom Barkany or the Barkany Entities made loans, among others.  Out-of-court recoveries have been obtained from other charitable donees, other investors, other relatives and other borrowers.  The Judgment Creditors and BARM have devoted substantial time and expense in pursuing recovery of creditor assets.  Yet, more than $40,000,000.00 is still owed on the Judgment.

At about the time of Barkany's arrest in March 2013, BARM learned that shortly before his arrest, Barkany had perpetrated another Ponzi scheme.  The victims of that scheme instituted litigation in state court in which they allege loss of at least $7,500,000.00.  Mr. Rosenberg and MDDC, in addition to Barkany, are also defendants in that litigation.

(ii)    MDDC, which received more than $2,000,000.00 from Barkany Entities in payment of Barkany's personal gambling debt and which nevertheless continued to allow him credit, was authorized by Barkany to provide information to Mr. Belsky.  In January 2013, it provided summary information which in Mr. Belsky's opinion was unusable and refused to respond to Mr. Belsky's follow-up questions about an unaccounted-for $700,000.00 which Barkany had paid to MDDC.

(iii)    Mr. Kessler refused to provide any information, notwithstanding the service of two subpoenas, and said nothing about a claim against Barkany.

8.    Each of the Petitioners had abundant opportunities to make a claim against Barkany or the Barkany Entities, but none did so until after being served with process by BARM.[5]

9.    BARM deposed Mr. Rosenberg on August 22, 2013.  During his deposition, Mr. Rosenberg acknowledged that he knew of Barkany's financial distress by at least mid-2011, when Barkany's house was to be sold to satisfy creditor claims.  He claimed that he was unaware of the fraud until March 2013, when Barkany was arrested.  Not until Mr. Rosenberg was questioned at his August 22, 2013 deposition did he say anything about a claim against his son-in-law, and even then he provided no supportive documentation and was uncertain of the amount of his claim.  He did not respond to BARM's subsequent written requests for additional information.  BARM sued Mr. Rosenberg on March 5, 2014, and on June 20, 2014 (five days before he filed the involuntary petition) Mr. Rosenberg filed a third-party complaint against

---

[5] BARM's complaints against Mr. Rosenberg, MDDC and Mr. Kessler are at Katz Declaration, Exhibits "F," "G" and "H."

Barkany seeking indemnity and contribution.[6]  Even then Mr. Rosenberg did not assert the claim that he now makes in the involuntary petition.[7]

10.      As noted above, MDDC refused to respond to Mr. Belsky's January 2013 requests for more than summary information.   BARM filed suit against MDDC on April 24, 2014. MDDC has not filed responsive pleadings.  It has, however, filed correspondence with the court enumerating alleged deficiencies in BARM's claim.  Its correspondence does not assert a claim against Barkany.   To BARM's knowledge, MDDC's June 25, 2014 joinder in the instant involuntary petition was its first assertion of its alleged claim.

11.      Mr. Kessler now alleges that he made a 90 day loan to Barkany in January 2011, evidenced by a promissory note which Mr. Kessler has not produced.  But even though the loan was in default by April 2011 and Mr. Kessler presumably knew of the sale of Barkany's home that year, he took no action on the alleged loan until after he was sued by BARM on May 7, 2014.  In response to that lawsuit, on June 19, 2014 Mr. Kessler filed a third-party complaint against Barkany alleging the claim on which he now apparently relies.[8]

12.      BARM's complaints against the Petitioners assert that each received millions of dollars of fraudulent transfers from Barkany and the Barkany Entities. BARM's complaint also demonstrates quite clearly that Mr. Rosenberg and Mr. Kessler aided and abetted Barkany's Ponzi scheme, before and after it was discovered, and helped Barkany conceal transfers of substantial amounts of money, even after Barkany had assured the Judgment Creditors that he

---

[6] Katz Declaration, Exhibit "J."

[7] As noted in footnote 4 *supra*, Mr. Rosenberg is a defendant in litigation brought by another group of Barkany victims.  In November 2013 Mr. Rosenberg filed a cross-claim against Barkany in that litigation.   As in his third-party complaint against Barkany in the BARM litigation, he sought indemnity but made no independent claim against Barkany.

[8] Katz Declaration, Exhibit "I."

had turned over substantially all of the assets in his possession and was cooperating with BARM's efforts to recover stolen funds.

13.    Mr. Rosenberg, MDDC and Mr. Kessler filed the instant involuntary chapter 7 petition on June 25, 2014, only weeks after each was sued by BARM. Given the timing, there can be no dispute that the primary if not the sole purpose of the petition is to obstruct BARM's lawsuits against them.

14.    Additionally, even if Petitioners might have claims against Barkany, which BARM denies, each of their claims is "the subject of a bona fide dispute as to liability or amount," which renders Petitioners ineligible to file an involuntary petition.

15.    For more than three years, Mr. Belsky has been conducting an investigation regarding Barkany's Ponzi scheme and the disappearance of many millions of dollars lost by the Judgment Creditors. In his opinion, which is set forth in detail in the Belsky Declaration, the notion that the Petitioners are owed money by Barkany is clearly contradicted by relevant records of Barkany's transaction and the Petitioners' failure to assert any claim against Barkany until recently. In addition, as demonstrated by Mr. Belsky, even after Barkany acknowledged in 2010 that he defrauded the creditors, he made additional substantial payments to each of the Petitioners (which he concealed from the Judgment Creditors), payment of which would have satisfied any debt owed to the Petitioners.[9]

---

[9] Belsky Declaration, throughout, but especially at ¶¶ 13, 17, 23, 32, 35-36, 42, 44-45, 52, 56-57.

## ARGUMENT

**A.    The Involuntary Petition Was Filed as a Litigation Tactic and in Bad Faith and Should Be Dismissed.**

16.    As the cases discussed below demonstrate, a petitioner who files an involuntary petition to invoke the Court's jurisdiction in order to gain a tactical advantage in pending litigation acts in bad faith, without a valid bankruptcy purpose, and the case should be dismissed.

17.    Section 303(b) of the Bankruptcy Code authorizes a small number of creditors – only one or three are needed - who are collectively owed at least $15,325 to file an involuntary petition, an action which publicly announces that the debtor "is generally not paying such debtor's debts as such debts become due." However, the law is clear that only a valid bankruptcy purpose justifies the filing of an involuntary petition and that one should not be filed as a litigation tactic.  As the Northern District of Iowa said in *In re Tichy Electric Company, Inc.*, 332 B.R. 364, 376 (Bankr. N.D. Ia. 2005):

> Because this weapon [the power given to creditors to file an involuntary petition] is so potent, its use must be strictly monitored.  The power of an involuntary petition must be exercised for the good of the entire creditor body and for legitimate bankruptcy purposes.  It is not intended to be used in an exclusively self-serving manner as a collection device.

18.    Similarly, at *In re Morris*, 115 B.R. 752, 757 (Bankr. E.D. N.Y. 1990) (internal quotation marks omitted), this Court said that the "filing of an involuntary petition should not be lightly undertaken."  This Court further stated:

> The Bankruptcy Court was not designed to be a forum for the trial and collection of an isolated disputed claim by a single creditor. … There is no special need for bankruptcy relief where a creditor can go to state court to seek collection of a debt.

115 B.R. at 757 (citations and internal quotation marks omitted).[10]

19.    In *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413 (Bankr. E.D. Pa. 2013), the Eastern District of Pennsylvania recently analyzed a situation similar to that here, although there the non-bankruptcy court litigation had been brought by the debtor. The debtor contended that the involuntary petition was a bad faith filing and an abuse of the bankruptcy system because it had been initiated by the petitioning creditors to frustrate the prosecution of the putative debtor's non-bankruptcy court claims. The Court agreed and dismissed the case because the primary petitioning creditor's motivation was to frustrate the prosecution of a pending arbitration proceeding as well as to force the debtor to pay his claim ahead of those of other creditors, both of which the Court found improper. According to the Court, even where a creditor has a judgment and is a bona fide creditor, the filing of an involuntary petition may be undertaken only for a proper bankruptcy purpose:

> [T]he fact that Mr. Dawson is a judgment creditor does not establish that he invoked this Court's jurisdiction for a proper bankruptcy purpose. As discussed below, the bad faith inquiry is a separate and independent from the inquiry as to a creditor's bona fides. *Shinko v. Miele,* 29 Fed. Appx. 890, 890–91 (3d Cir. 2002) (recognizing that a creditor's bad faith is an independent ground for dismissal of an involuntary petition); *In re Bock Transp., Inc.,* 327 B.R. 378, 381 (8th Cir. BAP 2005) (same). Contrary to the position of the Petitioning Creditors, <u>bad faith may be imputed to a bona fide creditor when that creditor has filed an involuntary petition for a non-bankruptcy purpose.</u>

---

[10] The *Morris* court also held that "a creditor who files an involuntary petition has an affirmative duty to reasonably investigate the totality of the circumstances surrounding a debtor's finances. … It must also determine whether the filing of a bankruptcy petition would indeed help the creditor to collect its debt and prevent the diminution of the estate through the attachment of the debtor's assets by third parties." 115 B.R. at 757.

500 B.R. at 424 (emphasis added). Notwithstanding that the Bankruptcy Code contains no express requirement that an involuntary petition be filed in good faith, bad faith disqualifies the petitioner from invoking the bankruptcy court's jurisdiction:

> While the Code may provide for specific sanctions for specific instances of bad faith, <u>bad faith on the part of any petitioner will generally disqualify a petitioner from invoking the jurisdiction of this Court.</u> Looking at the big picture, this Court understands the bad faith inquiry as relating to its jurisdiction. Being a court of equity, this Court's jurisdiction may not be invoked in bad faith.

500 B.R. at 424-25 (emphasis added).

20.     Continuing its analysis, the *Forever Green Athletic Fields* Court said that the valid purpose of a Chapter 7 case is to marshal a debtor's assets to achieve a greater distribution among creditors than would be available outside of bankruptcy:

> To invoke this Court's jurisdiction, <u>a petitioner must possess a valid bankruptcy purpose. In the context of Chapter 7 proceedings, that purpose must be to marshal a debtor's assets in order to achieve a greater pro rata distribution among a debtor's various unsecured creditors than what would be otherwise available outside of bankruptcy. A petitioner must have some plausible reason to believe that the bankruptcy system is necessary to maximize the recovery of a debtor's creditors.</u> As stated by the Third Circuit, in *Integrated Telecom,*
>
> To be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code. <u>It must seek to create or preserve some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy.</u>

500 B.R. at 424-25 (citing and quoting *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 119-20, 129 (3d Cir. 2004)) (citations deleted; emphasis added).

21.    The Court then turned to the tests to determine an involuntary petitioner's true intent.    First, the Court, situated in the Eastern District of Pennsylvania, noted that other jurisdictions including the Second Circuit employ a series of tests:

> <u>This Court would be naïve to assume that a petitioner will freely admit that it lacks a valid bankruptcy purpose.</u>  Accordingly, bankruptcy courts refer to a variety of tests to determine an involuntary petitioner's true intent. Courts of other jurisdictions, led by decisions issued by the Second and Eleventh Circuits, employ a series of tests to determine whether an involuntary petition was filed in bad faith. <u>These courts apply four separate inquiries to determine whether an involuntary petition was filed in bad faith: the improper use inquiry, the improper purpose inquiry, the reasonable person inquiry, and the Rule 9011 inquiry</u>. Courts do not hew to one of these tests. Rather, <u>courts apply these tests concurrently</u> as a part of their analysis of whether a petitioning creditor acted in bad faith.

500 B.R. at 425-26 (citations deleted; emphasis added).   Finding, however, that Third Circuit precedent suggests that a bankruptcy court should infer the purposes of a petitioner from the totality of circumstances, the *Forever Green* Court reviewed the facts and determined that the filing had been made to frustrate the debtor's efforts to litigate its non-bankruptcy claims and that such a purpose was sufficient to impute bad faith and lack of valid bankruptcy purpose:

> [T]he Debtor alleges that Mr. Dawson effectuated the filing of the involuntary petition for two improper purposes: (1) to frustrate the Debtor's efforts to litigate its claims against the ProGreen Parties; and (2) to force Mr. Day to pay on behalf of the Debtor the amounts due to the Dawsons pursuant to the Consent Judgment. Both, if supported by the record, would be sufficient to impute bad faith to Mr. Dawson. The Third Circuit has defined as a matter of principle that the filing for bankruptcy relief for the purpose of exerting pressure on an opponent in pending litigation is evidence of bad faith. *SGL Carbon Corp.,* 200 F.3d at 163–65 (recognizing that filing for bankruptcy relief solely for the purpose of gaining tactical advantage in pending actions is evidence that a petition lacks good faith) ….
>
> When a petitioner invokes this Court's jurisdiction in order to gain a tactical advantage in pending litigation, this Court may infer that

the petitioner lacks a valid bankruptcy purpose. *Integrated Telecom Express, Inc.*, 384 F.3d at 119–20; *SGL Carbon Corp.*, 200 F.3d at 165. <u>The same is true in involuntary proceedings.</u>

500 B.R. at 426-27 (emphasis added).  On this basis, the Court dismissed the case.

22.    Also, in *In re Manhattan Industries, Inc.*, 224 B.R. 195 (Bankr. M.D. Fla. 1997), the Middle District of Florida found that where a debtor had no cash flow or employees and no assets other than potential recovery on a pending fraud and negligent misrepresentation action against the petitioning creditor, the debtor had not been preferring its creditors or transferring its property to others and the "[creditor's] objective in filing the involuntary petition was an effort to affect the Debtor's position in the New Jersey proceedings. … [The creditor] thus did not act in good faith in filing its involuntary bankruptcy petition."  224 B.R. at 199.  The court dismissed the case, stating:

> Using the bankruptcy process as a means to promote MBC's individual interest is not consistent with the Bankruptcy Code as it will allow MBC to use bankruptcy laws as a sword rather than as a shield. *Shell Oil Co. v. Waldron (In re Waldron)*, 785 F.2d 936, 940 (11th Cir. 1986).
>
> The fundamental requirement that bankruptcy petitions be filed in good faith will be undermined by allowing MBC to proceed with its petition. <u>Unscrupulous creditors should not be allowed to change the outcome of an existing lawsuit by filing for refuge in the bankruptcy courts.</u> The parties have chosen the New Jersey proceedings to litigate their dispute. MBC has answered the Debtor's complaint and is extensively engaged in the course of discovery into the merits of the Debtor's claims.
>
> An inquiry is appropriate to determine the legitimate purpose of the parties who have sought to invoke the jurisdiction of bankruptcy and it is within the Court's discretion to take appropriate steps to prevent the abuse of the bankruptcy process pursuant to 11 U.S.C. § 105(a). There is no legitimate purpose for this involuntary petition. MBC's motivation in filing for involuntary relief is inconsistent with the policy behind involuntary bankruptcies. MBC thus lacked good faith due to its improper

purpose in filing its involuntary petition even if it had standing to file under § 303(b)(2).

224 B.R. at 201 (emphasis added). [11]

23.    As *Forever Green Athletic Fields* noted, other courts, led by decisions of the Second and Eleventh Circuits, use four separate inquiries to determine whether an involuntary petition was filed in bad faith: the improper use inquiry, the improper purpose inquiry, the reasonable person inquiry, and the Rule 9011 inquiry. 500 B.R. at 425 (citing *Lubow Machine Co. v. Bayshore Wire Products Corp.,* 209 F.3d 100 (2d Cir. 2000)). The improper use test questions whether the petitioning creditor used the involuntary bankruptcy process to obtain an improper advantage over other creditors rather than pursuing collection in the appropriate non-bankruptcy forum. The improper purpose test questions the petitioning creditor's reason for filing the involuntary petition and is virtually identical to the subjective test which focuses on the creditor's state of mind and motivations for filing the petition. The reasonable person inquiry, or objective test, measures bad faith according to the reasonable person standard. The Rule 9011 test combines the subjective and objective tests and is patterned after Rule 9011 of the Federal Rules of Bankruptcy Procedure, considering both the petitioning creditor's motives and whether he acted as a reasonable person in filing the petition. *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) ("Filing an involuntary petition with the intent to gain a strategic advantage, rather than to protect one's interest relative to other creditors or to prevent dissipation of assets, constitutes an improper purpose.").

---

[11] Additionally, the court held that a bona fide dispute existed as to the indebtedness owed by the debtor to the petitioning creditor, and that the petitioning creditor was an ineligible petitioner, because although the petitioning creditor had a judgment against the debtor, it was offset by a larger claim for return of franchise fees and security deposits. "It is not necessary that the debt sought to be set off be due when the case is commenced." 224 B.R. at 199-200. Similarly, here, if this case is maintained, the estate would have claims against each of the Petitioners greatly in excess of the amounts claimed by them in addition to the amounts already paid to them.

24.     The instant involuntary petition fails all of these tests.  Given the timing of the Petitioners' filing of the involuntary petition, it is clear that the only reason the petition was filed was to stay the actions brought against the Petitioners by BARM (as well as the litigation mentioned in footnote 4, *supra*, brought against Mr. Rosenberg and MDDC by another group of Ponzi scheme victims).[12]

25.     As noted above, it is improper to use the involuntary bankruptcy process to stay litigation pending against a petitioning creditor and thereby gain an advantage.  The Petitioners' state of mind and motivations for filing the involuntary petition now are quite obvious -- during the years over which their alleged claims have existed they have taken no actions to recover until now when surely they know that Barkany has no assets to distribute.  Clearly their intent is not to collect on their alleged claims but to impede Barkany's victims' efforts in recovering fraudulent transfers received by the Petition Creditors, an improper purpose for invoking this Court's jurisdiction.  For the same reasons, a reasonable person would conclude that, objectively, the Petitioners are not trying to benefit the overall creditor body, or even to collect their own claims.  And, finally, this filing, in these circumstances, does not meet Rule 9011's requirement that the petition not be presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation and that the allegations and other factual contentions therein have evidentiary support.

---

[12]As noted in the *Background* section of this memorandum, each of the Petitioners, to the extent that it may have a valid claim, has had its claim for an extended period of time.  Mr. Kessler has alleged that his claim dates to January 2011, more than three years ago.  Mr. Rosenberg has not provided any specifics, but his alleged claim allegedly dates to 2008.  MDDC has not provided any information whatsoever about its claim.  Yet, none of the Petitioners took any step to recover on these claims prior to BARM's recent commencement of fraudulent transfer actions against them.

**B.    The Involuntary Petition Does Not Satisfy the Requirements of Bankruptcy Code § 303(b) and Should be Dismissed.**[13]

26.    In addition to the bad faith evident from the filing of the involuntary petition as demonstrated above, none of the Petitioners has standing to file a petition because the claims they allege are "subject [to] a bona fide dispute as to liability or amount."  Section 303(b) requires, in pertinent part, that "[a]n involuntary case against a person [be] commenced by the filing with the bankruptcy court of a petition … by three or more entities, each of which is … a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount …, if such noncontingent, undisputed claims aggregate at least $15,325."

27.    The burden is on the Petitioners to establish a prima facie case that there is no bona fide dispute as to both liability and amount.  *In re Mountain Dairies, Inc.*, 372 B.R. 623, 633 (Bankr. S.D.N.Y. 2007) (petitioning creditor failed to establish prima facie case because it "never provided clear documentation of a sum certain that would be due [ ] after deducting the amounts in dispute").  As explained below, the Petitioners cannot satisfy this burden.

28.    The Bankruptcy Code does not define the term "bona fide dispute."  The courts have held, however, that a bona fide dispute exists where "there is an objective basis for either a factual or a legal dispute as to the validity of [the] debt."  *In re BDC 56 LLC*, 330 F.3d 111, 117-18 (2d Cir. 2003).  "Under the objective standard [there is a bona fide dispute], 'if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts …."  *Metz v. Dilley*, 339 B.R. 1, 6 (1st Cir. BAP 2006) (internal quotation marks deleted).  *See also B.D.W. Assocs., Inc. v. Busy Beaver Bldg.*

_____

[13] Any question as to BARM's standing to object to satisfaction of the requirements of § 303(b) is mooted because Barkany has moved for dismissal.  *See In re Kenval Marketing Corp.*, 38 B.R. 241 (Bankr. E.D. Pa. 1984).

*Centers*, 865 F.2d 65, 66-67 (3rd Cir. 1989) (likening bona fide dispute to one which would defeat summary judgment). The bona fide dispute inquiry involves a determination whether factual or legal challenges to claims have "any genuine and objectively determinable legal merit." *In re Elsa Designs, Ltd.*, 155 B.R. 859, 864 (Bankr. S.D.N.Y. 1993). "Once the Court identifies a bona fide dispute, the inquiry ends." *In re Euro-American Lodging Corporation*, 357 B.R. 700, 714 (Bankr. S.D.N.Y. 2007). "The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute." *In re BDC 56 LLC*, 330 F.3d at 118; *In re Mountain Dairies, Inc.*, 372 B.R. at 633.

29.    Furthermore, even a bona fide dispute regarding the amount of the claim precludes the holder of such a claim from filing an involuntary petition. Prior to the 2005 amendment of Section 303(b) to insert the phrase "as to liability or amount," there was some question about the impact of a dispute limited to amount. Since the amendment, however, "any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a bona fide dispute." *In re Euro-American Lodging Corporation*, 357 B.R. at 712 n. 8. *See also* 2 Collier on Bankruptcy ¶ 303.30[2] [b], 303–30 to 303–32 (15th rev. ed. 2006) (after the amendments made by BAPCPA, "disputes as to amount—not just liability—are sufficient to create a bona fide dispute.").

30.    The involuntary petition (Doc. 1) and corrected involuntary petition (Doc. 3) contain almost no detail about the Petitioners' claims. Nothing is alleged about the nature of the claims, the dates that the claims were created, whether there is any documentation for the claims, whether the claims are subject to offsets, etc. However, the little that is said acknowledges that the amounts of the Mr. Rosenberg and Mr. Kessler claims are subject to a bona fide dispute.

31.    At the bottom of the both involuntary petitions' third pages, under the $535,000.00 total of the Petitioners' claims, appear the words "Please see attachment." The attachment is revealing. It states that the listed amounts of Mr. Rosenberg's and Mr. Kessler's claims ($160,000.00 and $135,000.00, respectively), are "the minimal amounts currently owed to them." This constitutes an admission that Mr. Rosenberg's and Mr. Kessler's claims are subject to a bona fide dispute. *See Mountain Dairies*, 372 B.R. at 634.

32.    In *Mountain Dairies*, the petitioning creditor acknowledged that the amount alleged in its petition might not be the correct amount and that it would subsequently request leave of court to amend its petition to assert only the portion of its claim that would by then have been determined not to be subject to bona fide dispute. Judge Morris stated that the petitioner "glosses over a significant instruction in *In re BDC 56 LLC*, that the Court is to ascertain whether a bona-fide dispute exists, but 'is not to actually resolve the dispute.' 330 F.3d at 118 (emphasis added)." *Mountain Dairies*, 372 B.R. at 633. Continuing, Judge Morris stated, "There is no doubt that the dispute over both the liability and amount of Schneider–Valley's claim against Mountain Dairies would continue after the entry of an order for relief. Schneider–Valley would have this Court find no dispute for the purposes of the threshold requirement of an undisputed claim and then have this Court resolve multi-faceted disputes over the amount of that claim." *Id.*

33.    Commenting further, Judge Morris said:

> The crux of Schneider–Valley's argument is its willingness to make post-petition corrections to its initial claim to prove that, although hundreds of thousands of dollars may be in dispute, at least some amount (though ultimately no definitive amount) above the $13,475 threshold in 11 U.S.C. § 303(b) must not be in dispute. These concessions do not, as Schneider–Valley contends, eliminate the bona fide dispute. Rather, they raise serious concerns over the legitimacy of Schneider–Valley entire claim. That a claim could have been filed in good faith when a substantial portion of that claim was the subject of a dispute on its face is untenable. As noted

above, the proof offered by Schneider–Valley was insufficient to establish a sufficient claim even under the objective standard set forth in *In re BDC 56 LLC*. To Schneider–Valley's insufficient offer of proof, the Court adds other factors, including: (1) the absence of any judgment in Schneider–Valley's favor, (2) no admission of liability as to any amount by Mountain Dairies, (3) Schneider–Valley's inexplicable refusal to enforce the claim in the forum chosen by the parties by written agreement, (4) the fact that the purportedly "undisputed" claim comes after the parties proceeded for two years under an oral agreement while attempting to negotiate a new agreement, and (5) the fact that the involuntary petition was filed immediately after those negotiations ceased. It is possible that a state court will find that Mountain Dairies is liable to Schneider–Valley in some amount or even the entire amount claimed by Schneider–Valley in the petition. That possibility is insufficient to support an involuntary petition where, on the record before this Court, the liability, amount, and even the circumstances surrounding the parties' relationship are the subject of substantial dispute.

372 B.R. at 634.

34.    Under the holding of *Mountain Dairies*, the Petitioners have admitted that Mr. Rosenberg's and Mr. Kessler's claims are subject to a bona fide dispute. Moreover, as in *Mountain Dairies* and as explained below, there are no judgments in the Petitioners' favor (as there is in favor of BARM) and no one with anything at stake has admitted liability.

35.    But even had these admissions not been made, it is apparent that bona fide disputes exist as to the alleged claims. As detailed in the Belsky Declaration, a forensic financial fraud investigation specialist has studied the Barkany Ponzi scheme for more than three years, during which he has reviewed numerous financial records and has interviewed Barkany on many occasions.  Yet despite this intensive investigation, and BARM's and his attempts to obtain information from each of the Petitioners, he heard nothing about Mr. Kessler or MDDC having claims even though they were aware of his efforts to obtain information, and Mr. Rosenberg made no effort to assert any sort of a claim until after he was served with a subpoena by BARM

in 2013.  The Belsky Declaration demonstrates that each of the Petitioners received substantially more than the amount it now claims and thus has no net claim against Barkany or the Barkany Entities.    Despite  repeated  opportunities,  Mr.  Rosenberg  failed  to  provide  Mr.  Belsky substantiation of his claim.[14]

36.    To the contrary, as shown by Mr. Belsky, his investigation has determined that Mr. Rosenberg, Mr. Kessler and MDDC each received millions of dollars from Barkany and the Barkany Entities, payments that continued to be made after the initial Ponzi scheme had been publicly acknowledged by Barkany.  And, although it does appear that Mr. Rosenberg and Mr. Kessler at times provided funds to Barkany and the Barkany Entities, the amounts provided pale in comparison to the amounts which they received.  Mr. Rosenberg has acknowledged that he knew several years ago that Barkany was indebted to creditors for substantial amounts; even after obtaining such knowledge he assisted Barkany in secretly moving substantial amounts of money, amounts that were much more than sufficient to satisfy any claim that Mr. Rosenberg may ever have had.

37.    Mr. Kessler' claim is further belied by the inconsistency between his allegations and documents in the public records.  In Mr. Kessler's Third-Party Demand against Barkany, he alleges that on January 11, 2011 Barkany executed a $285,000.00 promissory note with Mr. Kessler, to be repaid within 90 days and that the loan was secured by a UCC-1 lien on Barkany's residence.[15]  There are at least four problems with Mr. Kessler's claim:  (i)  He has not provided a copy of the alleged promissory note; (ii) there is no UCC-1 that was filed against Barkany's

---

[14] Additionally, any claim submitted by MDDC must be examined not only for sufficiency under general law but also for strict compliance with the requirements of the New Jersey Casino Control Act, without which MDDC's claim would not be enforceable.  *GNOC Corp. v. Endico*, 876 F.2d 1076 (2d Cir. 1989).
[15] Katz Declaration, Exhibit "I," ¶¶ 4-8.

residence in January 2011, or for any date in 2011;[16] (iii) Mr. Kessler received at least $606,000.00 from Barkany subsequent to January 11, 2011; and (iv) Mr. Kessler did not claim he is owed any money by Barkany until after he was sued by BARM in 2014.[17]

38.    Given the information provided by Mr. Belsky, BARM submits that a bona fide dispute clearly exists as to both the liability and amount of each of the Petitioners' claims, and therefore the involuntary petition should be dismissed.  Alternatively, BARM submits that it should be afforded an opportunity to discover whether the Petitioners' claims have merit and to determine whether any amounts which may nominally be owed to them are subject to setoff by the millions of dollars which they received, after which a hearing should be held.

**C.**    **The Court Should Dismiss this Case Pursuant to Section 305(a).** [18]

39.    Section 305(a)(1) allows this Court to dismiss or abstain from an involuntary bankruptcy case if such dismissal or abstention is in the best interest of the debtor and its creditors.[19] The moving party bears the burden of demonstrating that the interests of the debtor and its creditors would benefit from dismissal or abstention.  *In re Selectron Management Corp.*, Case No. 10-75320-dte, slip op. at pp. 8-9 (Bankr. E.D.N.Y. 9/27/2010).  Several factors have been articulated as relevant to this inquiry:  (i) The economy and efficiency of administration; (ii) whether another forum is available to protect the interests of both parties or there is already a

---

[16] Katz Declaration, Exhibits "J" and "K."  Moreover, although there is a 2012 UCC-1 which contains Kessler's name, it shows the secured the secured party to be CCL Corporation.  Kessler's name appears only in an address. *Id.*

[17] Belsky Declaration, ¶ 42.

[18] A creditor has standing to move for dismissal under § 305(a).  *In re Jr. Food Mart of Arkansas, Inc.*, 234 B.R. 420, 421-22 (Bankr. E.D. Ar. 1999); *In re Westerleigh Development Corp.*, 141 B.R. 38 (Bankr. S.D.N.Y. 1992).

[19] "The court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if – (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; …."  11 U.S.C. § 305(a)(1).

pending proceeding in state court; (iii) whether federal proceedings are necessary to reach a just and equitable solution; (iv) whether there is an alternative means of achieving an equitable distribution of assets; (v) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (vi) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (vii) the purpose for which bankruptcy protection has been sought. *Id.*, slip op. at p. 9.  BARM submits that each of these factors warrants dismissal.

40.    Evaluation of these factors indicates, BARM submits, that the Court should dismiss this case.

41.    <u>Factor (i): The economy and efficiency of administration</u>.  BARM, the assignee of a judgment whose unsatisfied balance represents more than 90% of the unsecured debt of Barkany and the Barkany Entities,[20] has spent considerable time, effort and expense during the previous three and one-half years administering the estates of Barkany and the Barkany Entities. Should BARM be replaced by a chapter 7 trustee, that trustee and his counsel will have to duplicate BARM's and its counsel's efforts and spend considerable time and expense to get up to speed, and Barkany's victims will have to bear the brunt of that cost and delay.  At this point years down the road from discovery of the Ponzi schemes, where, unlike in the Ponzi scheme cases that have made news over the last few years, there is a relatively small group of victims and a perpetrator who claims to be cooperating and to have turned over his assets, appointing a chapter 7 trustee is neither economic nor efficient, and alleged creditors who are owed only about 1% of the total debt should not be allowed to drive the proceeding in that direction.

---

[20] The Petitioners hold about 1%.  The balance, if valid, is held by the victims who have brought the litigation described in footnote 4, *supra*.

42.    <u>Factors (ii) and (iii): Whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; and whether federal proceedings are necessary to reach a just and equitable solution.</u>   BARM submits that the interests of all creditors, including the Petitioners, will be adequately protected in the proceedings now being conducted in the New York state courts and the federal district courts, and there is no need for federal bankruptcy proceedings.   BARM submits that the Petitioners, who have no net claims to pursue, have initiated this proceeding not to collect on claims but to stymie fraudulent transfer actions pending against them in non-bankruptcy courts.   Those courts are able adequately to protect the Petitioners against BARM's fraudulent transfer actions, to the extent that protection is warranted.

43.    <u>Factor (iv), (v) and (vi):   Whether there is an alternative means of achieving an equitable distribution of assets; whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; and whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process.</u>   BARM was formed to collect and administer the assets of Barkany and the Barkany Entities and remains, willing to work with any person who has a legitimate claim, including the Petitioners should they have legitimate claims. BARM's assignors, the Judgment Creditors, who hold ninety percent or more of the unsecured debt in this case, are satisfied with this arrangement.   In comparison, the Petitioners' alleged claims are about 1% of the total, a relatively *de minimis* amount.   It would be inequitable to BARM and to the holders of more than ninety percent of the claims against Barkany and the Barkany Entities to allow the process they have been following for more than three years to be subverted and dictated by persons holding (allegedly) a *de minimis* percentage and who, BARM

contends, are actually liable for the return of millions of dollars of fraudulent transfers. Thus, there is an alternative means of achieving an equitable distribution of assets other than the instant bankruptcy proceeding; the debtor and the legitimate creditors have been working out and are able to continue working out a less expensive out-of-court arrangement which better serves all legitimate interests in the case; and this out of bankruptcy court effort has proceeded so far that it would be costly and time consuming to start afresh with the bankruptcy process.

44.    <u>Factor (vii): The purpose for which bankruptcy protection has been sought</u>. The timing of the filing of the involuntary petition demonstrates that the primary reason for its filing was to obtain the stay of the pending actions against the Petitioners. But the purpose of the automatic stay is to protect the debtor, not the Petitioners, and certainly not the recipients of fraudulent transfers and persons who assisted Barkany and the Barkany Entities in defrauding their victims and/or who otherwise have unclean hands. The filing of the involuntary petition to obtain stay protection is inappropriate and should not be condoned.

45.    The factors by which dismissal under Section 305(a) is evaluated support dismissal of the instant involuntary petition.

46.    Also, as this Court has said: "The Petitioning Creditor cannot utilize the bankruptcy process and wield a chapter 7 trustee as a weapon." *In re Selectron Management Corp.*, slip op. at p. 12. *See also In re AMC Investors, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (bankruptcy court should not be transformed into collection device); *In re Mountain Dairies, Inc.*, 372 B.R. 623.

47.    Where adequate relief exists in non-bankruptcy courts, the Bankruptcy Court should abstain even where Section 303(b)'s requirements are met. In *In re Westerleigh Development Corp.*, 141 B.R. 38 (Bankr. S.D.N.Y. 1992), after holding that a shareholder had

standing to contest an involuntary petition, Judge Schwartzberg noted that even where there is technical satisfaction of the Bankruptcy Code's requirements for an involuntary petition, the bankruptcy court should abstain where adequate relief exists in non-bankruptcy courts.   There, the petitioning creditor, who was one of the two deadlocked shareholders, had the requisite claim against the alleged debtor.   But the debtor was paralyzed and was incapable of operating its business affairs and the two shareholders were litigating in non-bankruptcy courts concerning the real estate that the debtor had been formed to develop.   The Court dismissed the petition, stating:

> Whether or not the petitioner has a bona fide claim against the debtor which is not in dispute is irrelevant.  The key point is that a bankruptcy court should not entertain a two-party dispute unless special circumstances exist, such as fraud, artifice or scan. … This is so because the parties can obtain adequate relief in a non-bankruptcy forum ….

141 B.R. at 40.   The Court continued by noting that the involuntary petition had been filed "mainly for the purpose of staying" the state court litigation, that the bankruptcy court should not be used by one shareholder to gain leverage over the other, and that the petition should be dismissed under Section 305(a)(1)  because the interests of the creditors and the debtor would be better served by dismissal:  "The two feuding shareholders may continue their state court actions and obtain appropriate relief without using the bankruptcy court as an additional weapon to resolve their disputes." *Id.*

48.     Accordingly, BARM respectfully submits that this case should be dismissed under Section 305(a) in the best interests of the creditors and Barkany.

**D.      The Involuntary Petition Should be Dismissed for Cause Pursuant to § 707(a).**

49.     Section 707(a) of the Bankruptcy Code provides, in part:  "The court may dismiss a case under this chapter only after notice and a hearing and only for cause …."   The quoted language is followed by examples of reasons for dismissal, but the examples are only illustrative.

*In re MacFarlane Webster Associates*, 121 B.R. 694, 696 (Bankr. S.D.N.Y. 1990).  Further, the statute covers both voluntary and involuntary cases, any party in interest can make a motion pursuant to Section 707(a), and although "cause" is undefined it lies in prejudice to a creditor. The bankruptcy courts must determine, on a case by case basis, whether an abuse constituting cause has occurred.  *MacFarlane Webster*, 121 B.R. at 696-97.

50.    It has been held that in determining whether cause exists, the test is whether dismissal is in the best interest of the debtor and his creditors.  *In re Schwartz*, 58 B.R. 923, 925 (Bankr. S.D.N.Y. 1986).  As to a debtor, best interest lies generally in securing an effective fresh start upon discharge and in the reduction of administrative expenses.  But where the debtor is burdened by non-dischargeable claims, the debtor's fresh start is significantly impaired and the bankruptcy process looses considerable meaning for him.  *Id*.  On the other hand, creditors are generally not prejudiced by dismissal since they will no longer be stayed from resorting to the state courts to enforce and realize on their claims.  *Id*.  A strong possibility that additional assets of the estate may be discovered argues against dismissal and for retention of jurisdiction in order to assure the equitable and full distribution of newly discovered assets and voidable transfers to all creditors.  *Id*.

51.    Here, the bad faith of the Petitioners in initiating this proceeding as a litigation tactic itself constitutes cause justifying dismissal.  *In re Carbaugh*, 299 B.R. 395 (Bankr. N.D. Tex. 2003).  In addition, because almost all of the claims against Barkany are non-dischargeable, he will not obtain a fresh start.  And there is little possibility after more than three years of investigation aided by Barkany that additional assets may be discovered for distribution to creditors  The creditors holding almost all of the claims against Barkany would prefer to see the proceeding be dismissed, that they be able to resume the state and federal court litigations which

were pending when this proceeding commenced and that they be able to avoid the added cost that this bankruptcy will impose upon them, and Barkany also would like to see this proceeding dismissed. Not only would Barkany and the creditors not be prejudiced by dismissal, they would benefit. BARM submits that cause to dismiss this case exists under Section 707(a).

## CONCLUSION

For more than three years since Barkany's first scheme came to light, the victims from whom $60 million was stolen have seen no need to invoke the jurisdiction of this Court to locate, to liquidate, to resolve claims to or to distribute what would be, in a bankruptcy context, Barkany's and the Barkany Entities' estates. Not until now, after BARM recently commenced actions against the Petitioners and other persons who benefited from Barkany's activities, has anyone sought to bring this matter into the bankruptcy court. The persons who have done so not only do not have claims that are not subject to bona fide dispute, but they are persons against whom BARM has recently filed suit asserting claims for millions of dollars.

The Petitioners have invoked the Court's jurisdiction as a litigation tactic, in bad faith, and their petition should be dismissed for that reason alone. Additionally, the petition should be dismissed because the Petitioners are not eligible to file an involuntary petition because they do not hold claims that are not subject to bona fide dispute as to liability or amount, because dismissal would best serve the interests of Barkany and his creditors and because there is good cause for dismissal.

For the foregoing reasons, BARM respectfully submits that the Court should enter an order dismissing this case pursuant to Bankruptcy Code Sections 105(a), 303(b), 305(a) and 707(a).

Dated: August 18, 2014                        Respectfully submitted,


                                          /s/ Shalom Jacob                   

                                              Shalom Jacob
                                              sjacob@lockelord.com
                                              Alan H. Katz
                                              akatz@lockelord.com
                                              LOCKE LORD LLP
                                              3 World Financial Center
                                              New York, New York 10281
                                              Telephone:  (212) 415-8600
                                              Facsimile:   (212) 812-8370
                                              Counsel to Barkany Asset Recovery and
                                              Management LLC