UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In re:

Gershon Barkany,

Alleged Debtor.

Case No. 8-14-72941 (LAS)

Chapter 7

### AFFIDAVIT OF MOTTY SHULMAN IN OPPOSITION TO
### GERSHON BARKANY AND BARKANY ASSET RECOVERY
### AND MANAGEMENT LLC'S MOTIONS TO DISMISS THE BANKRUPTCY CASE

I, Motty Shulman, do hereby affirm, under the penalty of perjury, as follows:

1.      I am a partner with the law firm of Boies, Schiller & Flexner LLP.  I am a
member in good standing of the bars of the States of New York and Florida.  I am a creditor of
Alleged Debtor, Gershon Barkany, ("Barkany").  I am also counsel to one or more creditors of
Barkany.

2.      I submit this affidavit in opposition to the Motions to Dismiss the Bankruptcy
Case filed by Barkany (Doc. No. 13) and Barkany Asset Recovery and Management LLC
("BARM") (Doc. No. 16) and to put certain facts before the Court.

3.      Specifically, I disagree with Barkany's claim that there "is already an adequate
process in place for resolving Barkany's creditors' claims."  Barkany Br. at p. 5.  I also disagree
with BARM's claim that this bankruptcy case should be dismissed because the interests of all
creditors will be adequately protected in the proceedings now being conducted in the New York
state courts and the federal district courts, and there is no need for federal bankruptcy
proceedings.  BARM Br. at p. 23.

4.      This bankruptcy is not only appropriate but also long overdue.  Although BARM
and its beneficiaries have been aware of Barkany's Ponzi scheme since 2010, BARM did not

14.     The claims brought by *Canadian Northern* is a perfect example of why a bankruptcy proceeding is necessary.  In the *Canadian Northern* action, Plaintiffs allege that, in early 2013, Barkany engaged in a second fraudulent scheme whereby $7.5 million was fraudulently obtained by Barkany and used to pay off Barkany's existing creditors.  A copy of the *Canadian Northern* Amended Summons and Complaint is attached hereto as Exhibit A.

15.     The defendants in the *Canadian Northern* action include, among others, two law firms used by Barkany, Schonberger and Joseph Rosenberg and Marina Development Company, LLC, which I understand are petitioning creditors in this action.

16.     BARM is not a party to the *Canadian Northern* action.

17.     To the extent Canadian Northern is successful in the pending fraudulent conveyance action, Schonberger, as well as the other *Canadian Northern* defendants, will have claims against Barkany for as much as $7.5 million.  To the extent that Canadian Northern in unsuccessful in its pending fraudulent conveyance action, it will have claims against Barkany for the same amount.

18.     Moreover, given BARM's knowledge of Barkany's fraud in 2010 and its failure to take steps necessary to prevent Barkany from committing a second fraud more than two years later, there may be subordination issues that can only be adjudicated in the context of a bankruptcy proceeding.

19.     I am also surprised by BARM's statements in its brief that it holds "ninety percent or more of the unsecured debt in this case" and "the debtor and the legitimate creditors have been working out and are able to continue working out a less expensive out-of-court arrangement which better serves all legitimate interests in the case."  BARM Br. at pp. 23-24.  These statements are flatly contradicted by BARM's counsel's own statements.

20.    In its brief, BARM claims that "more than $40,000,000.00 is still owed on the Judgment." BARM Br. at n. 4.  BARM also acknowledges that the victims of the *Canadian Northern* scheme "allege loss of at least $7,500,000.00." Id.  Simple math indicates that, even if there are no other victims of Barkany's fraud, BARM's claims are substantially less than 90% of the unsecured debt.

21.    Moreover, in a June 27, 2014 letter to Judge Leonard D. Wexler, in connection with Barkany's criminal case (a copy of which is attached hereto as Exhibit B), BARM's counsel told Judge Wexler that it believes Barkany "concealed assets and bank accounts" from BARM and that BARM's efforts "to obtain even basic assistance from Mr. Barkany have repeatedly been rebuffed with refusals and false information." BARM's counsel continues that Barkany "has stonewalled our recent efforts to recover assets and protect our client's interests." These statements by BARM, in the context of Barkany's criminal proceeding, are simply inconsistent with BARM's claim in this proceeding that "the debtor and the legitimate creditors have been working out and are able to continue working out a less expensive out-of-court arrangement." BARM Br. at p. 24.

22.    Finally, I am aware of certain individuals who have received funds from Barkany, who for ethical or legal reasons desire to return those funds to the rightful victims of Barkany's fraud.  To date, they have not done so because they want to make sure that the funds will be provided to Barkany's victims in an equitable manner – not simply to select creditors of Barkany, who were aware of Barkany's fraud two and half years before he was arrested.

Dated:  September 8, 2014

_____

Motty Shulman

State of New York    )
                          ) ss:
County of New York  )

Subscribed and sworn to before me this 8th day of September, 2014

_____

Notary Public

SHARI GINSBERG
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY
LIC. #01GI6275451
COMMISSION EXPIRES 01/28/17

# Exhibit A

Jul-02-2013 02 36 PM ALAN B. HERTZ P.C. 718-258-4994

1/21

FILED: KINGS COUNTY CLERK 07/01/2013

NYSCEF DOC. NO. 6

INDEX NO. 501806/2013

RECEIVED NYSCEF: 07/01/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

CANADIAN NORTHERN REALTY LLC,
CANADIAN NORTHERN REALTY LLC. On behalf
of its members, METRO EQUITY HOLDINGS LLC,
169 16TH STREET LLC, ABRAHAM LOFFLER,
WLCF METRO EQUITY HOLDINGS LLC, WL
METRO HOLDINGS LLC, LAW OFFICES OF
ALLAN LEBOVITS, as nominee, L'CHAYIM
FOUNDATION, INC., DAVID WEINBERGER and
REFOEL LEBRACHT,

Plaintiffs,

-against-

GERSON BARKANY A/K/A GARY BARR, ALAN
GERSON, JASON ROSENTHAL, ALFRED
SHOENBERGER MARINA DEVELOPMENT
COMPANY, LLC, OLD WORLD INVESTMENTS,
SAN SPREI, JOHNATHAN ZELINGER, JOSEPH
ROSENBERG, FIRST AMERICAN TITLE
INSURANCE CORP. BRUCE MONTAGUE &
PARTNERS and MORRISON & FOERSTER,

Defendants..

---

Index No.: 501806/2013
Date Purchased:

**AMENDED SUMMONS
AND COMPLAINT**

Plaintiff designates Kings
County as the place of trial.

The basis of venue is plaintiffs'
place of business.

**To the above named Defendants:**

YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve
a copy of your answer, or, if the Complaint is not served with this Summons, to serve a Notice of
Appearance, on the Plaintiffs' Attorney within 20 days after the service of this Summons,
exclusive of the day of service (or within 30 days after the service is complete if this Summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
Complaint.

Dated: New York, New York
July 1, 2013

Robert Rimberg
GOLDBERG & RIMBERG PLLC
*Attorneys for Plaintiff*
115 Broadway – 3rd Floor
New York, New York 11201
(212) 697-3250

Notice: The nature of this action is for conversion, fraud, misrepresentation, breach of fiduciary duty, accounting and breach of contract causing damages in the amount of $20,000,000.00.

To:  GERSHON BARKANY a/k/a GERSHON S. BARKANY a/k/a GARY BARR.
     622 Jarvis Ave
     Far Rockaway, NY 11691-5440

To:  ALAN GERSON c/o BRUCE MONTAGUE & PARTNERS
     21245 26TH Avenue, Ste 7
     Bayside, NY. 11360-1901

To:  ALFRED SCHONBERGER,
     5117 14th Avenue
     Brooklyn, NY, 11219

To:  MARINA DISTRICT DEVELOPMENT COMPANY, LLC,
     1 Borgata Way
     Atlantic City, NJ, 08401

To:  MORRISON & FOERSTER
     1290 Avenue of the Americas
     New York, NY 10104-0050

To:  FIRST AMERICAN TITLE INSURANCE CORP.
     633 3rd Avenue
     New York, NY 10017

To:  OLD WORLD INVESTMENTS, INC.
     Suite 1800 708 Third Avenue
     New York, New York, 10017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

CANADIAN NORTHERN REALTY LLC, CANADIAN NORTHERN
REALTY LLC, On behalf of its members, METRO EQUITY HOLDINGS
LLC, 169 16TH STREET LLC, ABRAHAM LOFFLER, WLCF METRO
EQUITY HOLDINGS LLC, WL METRO HOLDINGS LLC, LAW
OFFICES OF ALLAN LEBOVITS, as nominee, L'CHAYIM
FOUNDATION, INC., DAVID WEINBERGER and REFOEL LEBRACHT

VERIFIED
COMPLAINT

                                Plaintiffs,

Index No:

                                -against-

GERSON BARKANY A/K/A GARY BARR, ALAN GERSON, JASON
ROSENTHAL, ALFRED SHONBERGER MARINA DEVELOPMENT
COMPANY, LLC, OLD WORLD INVESTMENTS, SAM SPREI,
JOHNATHAN ZELINGER, JOSEPH ROSENBERG, FIRST AMERICAN
TITLE INSURANCE CORP. BRUCE MONTAGUE & PARTNERS and
MORRISON & FOERSTER ,

                                Defendants.

Plaintiffs, Canadian Northern Realty LLC, Canadian Northern Realty LLC on behalf of its

members, Metro Equity Holdings LLC, 169 16th Street LLC, Abraham Loffler, WLCF Metro

Equity Holdings LLC, WL Metro Holdings LLC, Law Offices Of Allan Lebovits, as nominee,

L'Chaim Foundation, Inc., David Weinberger and Daniel Lebracht by their attorneys, Goldberg &

Rimberg PLLC, as and for their verified complaint allege as follows upon information and belief:

                                PARTIES

1.      Plaintiff Canadian Northern Realty LLC is a Delaware limited liability company

organized under the laws of the State of New York.

2.      Canadian Northern Realty LLC is a Delaware limited liability company whose

members include Metro Equity Holdings LLC, Gary Barr and Yehuda (Jacob) Stolzberg.

3.    Metro Equity Holdings LLC is a limited liability company organized under the laws of the State of New York.

4.    169 16TH Street LLC is a limited liability company organized under the laws of the State of New York.

5.    Abraham Loffler is an individual residing in the State of New York, County of Kings ("Loffler").

6.    WLCF Metro Equity Holdings LLC is a limited liability company organized under the laws of the State of New York.

7.    WL Metro Holdings LLC is a limited liability company organized under the laws of the State of New York.

8.    The Law Offices of Allan Lebovits, whose offices are located in Kings County, acted as nominee in the instant transaction.

9.    David Weinberger is an individual residing of the State of New York County of Kings.

10.    Refoel Lebracht is a resident of the State of New York.

11.    Gershon Barkany A/K/A Gary Barr is an individual residing in the State of New York (hereinafter referred to as "Barr").

12.    At all relevant times, Gershon Barkany used the name Gary Barr when dealing with Plaintiffs in order to hide his true identity and name.

13.    Alan Gerson ("Gerson") is an individual residing in the State of New York.

14.    Gerson is an attorney admitted to practice Law in the State of New York and is currently registered to practice law in the State of New York.

15.    At all relevant times attorney Gerson worked for Bruce Montague & Partners.

16.     Bruce Montague & Partners maintains an office for the practice of law in the State of New York.

17.     Jason Rosenthal is an individual residing in the State of New York.

18.     Alfred Shonberger is an individual residing in the State of New York.

19.     Marina Development Company, LLC is a limited liability Company authorized to operate under the laws of the State of New York.

20.     Marina Development Company, LLC is a foreign entity authorized to business in the State of New York.

21.     Marina Development Company, LLC is a company that operates a Casino licensed in the State of New Jersey.

22.     Old World Investments is a limited liability Company organized in the State of New York.

23.     Old World Investments is an alias for Sam Sprei a resident of the State of New York.

24.     Jonathan Zelinger is an individual residing in the State of New York.

25.     Joseph Rosenberg is an individual residing in the State of New York.

26.     First American Title Insurance Corp. is a New York corporation.

27.     Morrison Foerster is a law firm with offices in the State of New York.

## BACKGROUND AND FACTS

28.     In or about September 2012 Yehudah a/k/a "Jacob" Stolzberg ("Stolzberg") told Loffler, a friend of Stolzberg, that his attorney Gerson had a client named Barr who was looking for investors to participate in the purchase of a West 28th Street property.

29.     Barr's real name is Gershon Barkany.

30.   The information as to the true name of Barr was deliberately not disclosed to Loffler.

31.   The true name of Defendant Barr was withheld from Loffler so that he would not be able to discover the true identity of Barkany.

32.   At the time that Loffler was introduced to Barr, Barr had been engaged in schemes in which he stole millions of dollars from investors throughout the New York metropolitan area.

33.   Stolzberg told Loffler that the money invested by Loffler would be used to purchase a property located on 105-107-111 West 28th Street in Manhattan, New York with adjacent air rights ("West 28th Street Investment").

34.   Stolzberg told Loffler that immediately after the purchase of the West 28th Street Investment it would be flipped and sold for a profit.

35.   Loffler, through 169 16th Street LLC, agreed to invest $500,000 with Barkany towards the purchase of the West 28th Street Investment.

36.   Upon information and belief West 28th Street Investment never existed and was part of Barr's various Ponzi schemes.

37.   Subsequent to investing in the West 28th Street Investment Stolzberg approached Loffler and solicited him to invest in another property with Barr.

38.   Stolzberg informed Loffler that Barr had sourced an investment at 1 West 37th Street ("West 37th Street Investment").

39.   Loffler told Stolzberg that he wanted to talk to someone in order to find out more about Barr before participating in the West 37th Street Investment.

40.    Loffler was informed by Stolzberg that the legal work for the West 37th Street Investment was being handled by attorney Gerson, Barr's attorney.

41.    Loffler was informed by Stolzberg that Gerson had done some legal work for Stolzberg and that his word could be trusted.

42.    Loffler asked Stolzberg to arrange for him to speak to attorney Gerson regarding the transaction and as a character reference for Barr.

43.    Stolzberg arranged a conference call between himself, Gerson and Loffler.

44.    During the conversation, Loffler asked attorney Gerson about the character and honesty of Barr.

45.    Gerson told Loffler that he had known Barr for quite some time.

46.    Gerson told Loffler that he had a close personal relationship with Barr.

47.    Gershon said he knew Barr for more than five (5) years.

48.    Gerson told Loffler that he/his law firm had represented Barr in the past.

49.    Gerson told Loffler that, with the exception of one investment went bad, due to the poor economy, Barr's real estate investments were profitable.

50.    Gerson told Loffler that Barr was honest and reputable and that Barr was a good man.

51.    Attorney Gerson and Bruce Montague & Partners knew of Barr's disreputable past and failed to disclose the same to Loffler.

52.    Loffler asked attorney Gerson if he was going to be the attorney for the 37th Street Investment.

53.    Attorney Gerson responded that he/his firm was going to be the transactional attorney for the West 37th Street Investment.

6.1

54.    Plaintiff asked attorney Gerson if the 37th Street Investment was solid.

55.    Plaintiff asked attorney Gerson if he should participate in the 37th Street Investment.

56.    Attorney Gerson told plaintiff, *inter alia*, that based on what he knows of Barr it should all go smoothly without incident.

57.    Loffler asked Attorney Gerson if he would investigate the viability of the investment, to which he responded "yes".

58.    Attorney Gerson told Plaintiff Loffler that he would perform some of the due diligence for the West 37th Street Investment and that he should feel secure.

59.    Attorney Gerson said he would of course share all the information with Loffler.

60.    Loffler relying on the assurances of attorney Gerson agreed to invest $1,700,000 for West 37th Street Investment.

61.    Attorney Gerson's law office prepared a Participation Agreement.

62.    Upon information and belief, the Participation Agreement was drafted by attorney Gerson or someone from his office.

63.    Attorney Gerson furnished the Participation Agreement to Loffler.

64.    The Participation Agreement listed the total purchase price for the 37th Street Investment as $25,000,000 with a $2,500,000 deposit required.

65.    Under the Participation Agreement the $2,500,000 was to be refunded to Loffler based on a specified timeline with a kicker should the contract of sale for the West 37th Street Investment be assigned or flipped.

66.    The only documentation provided to Loffler in connection with the abovementioned 37th Street investment was a Participation Agreement.

67.    Upon information and belief The West 37th Street Investment never existed and was part of Barr's various Ponzi schemes.

68.    In and around January 2013, Barr approached Loffler about a third "opportunity."

69.    Barr told Plaintiff that he had the opportunity to purchase a Midtown building known as The Metro, with an address of 301 West 53rd Street ("The Metro").

70.    Barr arranged for Loffler to tour the building.

71.    Barr told Loffler that he needed $7,500,000 for a *soft* deposit to tie up The Metro and that the building would be flipped for a "profit" before the money would go hard.

72.    Barr told Loffler that if the Metro deal could not be flipped his entire investment would be returned.

73.    Loffler informed Barr that he would invest in The Metro deal with others.

74.    To facilitate The Metro deal, Barkany using the alias of Gary Barr with Yehuda "Jacob" Stolzberg formed Canadian Northern Realty LLC a Delaware limited liability company ("Canadian").

75.    Canadian retained the services of Morrison Foerster to act as legal counsel.

76.    Morrison and Foerster, Canadian's attorneys drafted an operating agreement.

77.    In or about January, 2013, Loffler told his friend David Weinberger ("Weinberger") about his investments with Barr, more particularly The Metro.

78.    Weinberger agreed to put together several investors for The Metro deal.

79.    To invest in The Metro, Loffler and Weinberger formed Metro Equity Holdings LLC ("Metro Equity").

80.    The members of Metro Equity are WLCF Metro Equity Holdings LLC ("WLCF") and WL Metro Holdings LLC ("WL").

8.1

81.    The Canadian operating agreement, dated January 30, 2013, lists the members of Canadian as Metro Equity – 64%; Gary Barr – 17.50%; and Yehudah (Jacob) Stolzberg – 17.50%.

82.    On or about January 31, 2013, Barr presented Loffler with a letter of intent for Canadian Northern LLC, or an affiliate to purchase The Metro from Westbrook Partners LLC at a price of $232,000,000.00 ("LOI").

83.    Unbeknownst to Plaintiffs the LOI was a complete fraud.

84.    The LOI required the abovementioned *soft* deposit in the amount of $7,500,000.

85.    The money needed by Metro Equity, as stated in the Canadian operating agreement, was $7,500,000.

86.    The initial money by the members of Metro Equity were:

Loffler: $4,000,000[1]

WLCF $1,750,000[2]

WL: $1,750,000[3]

Total: $7,500,000

87.    The abovementioned money was wired as directed by Barr.

88.    As part of the *soft* deposit Barr told Loffler to pay $2,000,000 to Alfred and Judith Schonberger.

89.    Barr represented to Loffler that Alfred and Judith Schonberger had advanced $2,000,000.00 that was used as an initial deposit on The Metro.

---

[1] $2,000,000 was paid to Alfred and Judith Shonberger directly.
[2] L'Chayim Foundation Inc. wired $1,450,000 and Law Offices of Allan Lebovits, as nominee wired $350,000.
[3] Refoel Lebracht wired $1,750,000

9/

90.    In or about February 2013, Loffler arranged for two cashier's checks to be issued from the 169 16th Street LLC bank account at Capital One payable to Alfred and Judith Schonberger. One check is in the amount for $1,450,000 and the other check in the amount of $550,000 for a total of $2,000,000.

91.    When the checks were delivered to Alfred and Judith Schonberger there was a notation that the check were being tendered as a "reimbursement for wire to American Title 3020509600" that was purported to have been given by Alfred and Judith Schonberger for The Metro investment.

92.    These checks were subsequently deposited into an account #45634912 with an endorsement of the checks by Alfred and Judith Shonberger.

93.    The memo on the check put Alfred and Judith Schonberger on actual notice that the money was given to them as repayment of a deposit given respecting The Metro investment.

94.    Upon information and belief Alfred and Judith Shonberger never gave any deposit for the Metro.

95.    Upon information and belief Alfred and Judith Shonberger had no dealings with American Title or title bearing "3020509600".

96.    Barr directed that the remaining $5,500,000 needed from Metro Equity its investors should be wired into a TD Bank Account under the name First American Title Insurance Corp.

97.    Barkany represented to Plaintiff that the funds being deposited into the TD Bank Account were to be held in escrow in the account pending release of the funds for The Metro investment.

98.    On or about February 11, 2013, Barr opened a TD Bank N.A. account No. 4279356583 in the name of First American Title Insurance Corp.

10,

99.    Barr provided Plaintiffs with an Escrow Agreement between Canadian and First American (hereinafter Escrow Agreement).

100.    The Escrow Agreement required that the escrowed funds would not be released without direction from Canadian.

101.    Barr gave Plaintiffs the TD wire instructions for deposit of the funds into the TD Escrow Account.

102.    The escrow account Barr opened at TD Bank N.A. account #4279356583 was not an account under the auspices of a title company.

103.    Barr lied to Loffler when he represented that the TD Bank account was a title company account.

104.    Barr represented to Loffler and Weinberger that First American Title Insurance Company was in fact providing title insurance for the purchase of The Metro.

105.    Barkany also represented to Loffler and Weinberger that First American Title Insurance Company would be acting as an escrow agent for the purchase of The Metro.

106.    The TD account was not affiliated with First American Title Insurance Company.

107.    The TD account was affiliated with First American Title Insurance Corp. which is an entity that was created by or for Barkany a/k/a Barr because it sounded similar to the First American Title Insurance Company which is a *bona fide* title insurance company.

108.    First American Title Insurance Corp. escrow account was used by Barr to confuse investors and dupe them into believing that they were depositing their funds with a *bona fide* title company.

109.    Upon information and belief, the sole purpose of the First American Title Insurance Corp. escrow account was to provide Barr the ability to funnel money to destinations of his choice.

110.    Plaintiffs, individually and collectively, deposited money into the First American Title Insurance Corp. to fund what Barkany a/k/a Barr represented to them was the funds to purchase The Metro.

111.    Plaintiffs, individually and collectively, did not at any time authorize the use of the money they deposited into the escrow to be used by or applied or released except for the express purpose of funding the down payment for The Metro investment.

112.    The money deposited into the First American Title Insurance Corp. escrow account by Plaintiffs was immediately withdrawn by Barr or others acting with him or on his behalf to pay third parties to whom Barkany a/k/a Barr promised payment.

113.    The money deposited into the First American Title Insurance Corp. escrow account was not used for the *soft* deposit on The Metro investment.

114.    Subsequently, in or about early March 2013, Barkany a/k/a Barr presented a fabricated purchase agreement for The Metro to Loffler and Weinberger.

115.    On or about February 12, 2013, Barr transferred to Jason Rosenthal $850,000 from the Barkany's TD escrow account.

116.    On or about February 12, 2013, Barr transferred to Old World Investments $300,000 from Barkany's TD escrow account.

117.    On or about February 12, 2013, Barr transferred Alfred Schonberger $220,000 from Barkany's TD escrow account.

12,

118.    On or about February 12, 2013, Barr transferred to Jonathan Zelinger $150,000 from the TD escrow account.

119.    On or about February 12, 2013, Barr transferred to Alan Gerson $140,600 of from the TD escrow account.

120.    On or about February 12, 2013, Barr transferred to Joseph Rosenberg $51,700 of Plaintiff's money from the TD escrow account.

121.    On or about February 13, 2013, Barr transferred to Joseph Rosenberg an additional $150,000 from the TD escrow account.

122.    On or about February 13, 2013, Barr transferred to the law firm of Morrison Foerster $90,000 from the TD escrow account.

123.    On or about February 14, 2013, Barr transferred to Alan Gerson an additional $1,780,000 from the TD escrow account.

124.    On or about February 14, 2013 Barkany withdrew, in cash, $500,000 of Plaintiff's money from the TD escrow account.

125.    On or about February 14, 2013 Barr transferred to Marina District Development LLC $370,000 from Barkany's TD escrow account.

126.    Any remaining funds were withdrawn by Barkany a/k/a Barr when he closed the TD escrow account on February 19, 2013.

127.    Defendants performed no services, or performed services that did not constitute reasonably equivalent value in exchange for the various transfers they received.

128.    Defendants knew they had no right to any of the monies received.

129.    Defendants knowingly accepted and kept money to which they were not entitled.

13.

130. At all relevant times to this Complaint, Barkany and his affiliated entities were insolvent. Each of the various transfers from Barkany and his affiliated entities to the Defendants was made with the intent to hinder, delay and defraud plaintiffs.

131. Shortly thereafter, in or about the end of March 2013, Barkany a/k/a Barr was arrested by the Federal Bureau of Investigation on charges related to his operation of a multimillion dollar Ponzi scheme.

132. Barkany a/k/a Barr has admitted to federal prosecutors that all of the investment opportunities as alleged herein were fictitious.

133. As of the date of this Complaint, Barr, using his real name, has pleaded guilty to that all of the underlying paperwork for the investment opportunities as listed in this Complaint was completely fraudulent.

### AS AND FOR A FIRST CAUSE OF ACTION

134. By Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 133 hereof as if more fully set forth herein.

135. Defendants have exercised unauthorized dominion and control over Plaintiffs money.

136. Defendants' dominion and control over Plaintiffs money has interfered with Plaintiffs rights to Plaintiffs money.

137. By reason of the conduct of Defendants they have converted the funds of Plaintiffs and is obligated to Plaintiff in the sum of $7,500,000.00 with interest from the date of the conversion.

14,

## AS AND FOR A SECOND CAUSE OF ACTION

138.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 137 hereof as if more fully set forth herein.

139.    At the time of the various transfers, Barkany and/or First American was insolvent or was rendered insolvent as a result of the various transfers.

140.    Barkany did not receive fair consideration for the various transfers.

141.    The transfers constitute fraudulent conveyances in violation of the Debtor Creditor Law §273.

142.    Plaintiffs may avoid the various transfers under the New York Debtor ad Creditor Law §273.

143.    Accordingly, Plaintiffs are entitled to Judgment against Defendants: (a) setting aside the various transfers plus interest and costs.

## AS AND FOR A THIRD CAUSE OF ACTION

144.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 143 hereof as if more fully set forth herein.

145.    Upon information and belief, at the time the various transfers were made, Barr and or First American had incurred, believed that he would incur, or was intending to incur debt beyond his ability to pay as they matured.

146.    Barr did not receive fair consideration for the various transfers.

147.    The various transfers constitute fraudulent conveyances in violation of the New York Debtor Creditor Law §275.

148.    Accordingly, Plaintiffs are entitled to Judgment against Defendants; (a) setting aside the various transfers plus interest, costs and attorneys' fees.

151

## AS AND FOR A FOURTH CAUSE OF ACTION

149.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 148 hereof as if more fully set forth herein.

150.    The various transfers were made with the actual intent to hinder, delay or defraud Barr's present or future creditors.

151.    The various transfers constitute fraudulent conveyances in violation of the New York Debtor Creditor Law §276.

152.    Plaintiffs may avoid the various transfers under the New York Debtor Creditor Law §276.

153.    Accordingly, Plaintiffs are entitled to Judgment against Defendants setting aside the various transfers plus interest, costs and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION

154.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 153 hereof as if more fully set forth herein.

155.    The various transfers constitute fraudulent conveyances of assets in violation of New York Debtor Creditor Law §276 (a).

156.    Plaintiffs may avoid transfers under New York Debtor Creditor Law §276.

157.    Accordingly, Plaintiffs are entitled to Judgment against Defendants setting aside the various transfers plus interest, costs and attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION

158.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 157 hereof as if more fully set forth herein.

159.    The transfers to the various Defendants were without fair consideration.

16

160.    The various transfers to the Defendants were under circumstances in which Defendants would knowingly be unjustly enriched if they retained the value of the transfers.

161.    Defendants have been unjustly enriched and may not in equity retain the money from the transfers and may not retain the money transferred to them from the TD escrow account.

162.    By reason of the foregoing, Defendants are liable to Plaintiffs under New York Common law for unjust enrichment in the amount they each received in an amount to be determined at trial.

## AS AND FOR AN SEVENTH CAUSE OF ACTION

163.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 162 hereof as if more fully set forth herein.

164.    Plaintiffs deposited the monies as discussed herein pursuant to an Escrow Agreement.

165.    Plaintiffs deposited monies as discussed herein an account that was designated as an escrow account.

166.    All the monies as discussed herein and deposited into escrow is and remains the property of Plaintiffs.

167.    Barr had no right to transfer Plaintiffs money without the Plaintiffs express consent and approval.

168.    Barr took Plaintiffs money by wiring the money to various recipients without Plaintiffs consent and approval.

169.    Defendants received Plaintiffs money from an escrow created by and for Plaintiffs.

17.,

170.    By reason of the foregoing, Defendants must disgorge the amounts they each received.

### AS AND FOR AN EIGHTH CAUSE OF ACTION

171.    Plaintiffs repeat and reallege the allegations of the complaint set forth in paragraphs 1 through 170 hereof as if more fully set forth herein.

172.    Defendants Gerson and Bruce Montague & Partners had a duty, when asked by Loffler a potential investor, as to disclose Barr's true identity as being Gershon Barkany.

173.    Defendants Gerson and Bruce Montague & Partners had a duty to tell the truth about Barr when asked by Loffler, a potential investor, in a transaction in which they were acting as legal counsel.

174.    Defendants Gerson and Bruce Montague & Partners had an obligation to tell the truth to Loffler in response to his various questions posed regarding Barr.

175.    Defendants Gerson and Bruce Montague & Partners has actual knowledge of Barr's past history.

176.    Defendants Gerson and Bruce Montague and Partners by their lies and misrepresentations provided substantial assistance to Barkany in defrauding Plaintiffs.

177.    Gerson and Bruce Montague & Partners aided and abetted Barr in all his fraudulent activities causing damages to Plaintiffs in the sum of $7,500,000.

18,

**WHEREFORE**, Plaintiff prays that the Court enter Judgment as follows:

On the First through Eighth causes of action $7,500,000, attorneys' fees and costs and such other and further relief as to this Court seems just and proper.

Dated: June 30, 2013
      New York, New York

                                            Goldberg & Rimberg PLLC

                                  By:
                                                Robert Rimberg

                                  *Attorneys for Plaintiffs*
                                  115 Broadway, Ste. 302
                                  New York, New York 10006
                                  (212) 697-3250

19

STATE OF NEW YORK    )
                     )SS.;
COUNTY OF NEW YORK   )

The undersigned affirms the following statement to be true under penalties of perjury pursuant to Rule 2106 of the Civil Practice Law and Rules.

That he is an attorney at law and a member of the firm of Goldberg & Rimberg, PLLC., attorneys for plaintiff, has read the foregoing document and knows the contents thereof, and that the same is true to the knowledge of affirmant except as to the matters therein alleged upon information and belief and that as to those matters he believes them to be true; with the basis for such belief being communication with plaintiff's representatives.

That the reason why this affirmation is being made by affirmant and not by plaintiff, is that said plaintiff does not maintain an office nor does it have and officer or director in the county where affirmant's firm maintains its offices.

Dated: New York, New York
       July 1, 2013

Robert L. Rimberg

20.

# Exhibit B



# Locke
# Lord LLP

Attorneys & Counselors

Three World Financial Center
New York, NY 10281
Telephone: 212-415-8600
Fax: 212-303-2754
www.lockelord.com

Alan H. Katz
Direct Telephone: 212-415-8509
Direct Fax: 212-812-8380
akatz@lockelord.com

June 27, 2014

Judge Leonard D. Wexler
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

Re:    United States of America v. Gershon Barkany, No. 13-cr-00362

Dear Judge Wexler:

We represent Cortland Realty Investments LLC, which lost over $45 million in the Ponzi scheme perpetrated by Mr. Barkany during the period 2008 to 2010 (the "First Barkany Ponzi Scheme"), the various other creditors of the First Barkany Ponzi Scheme and Barkany Asset Recovery & Management LLC, an entity established by our clients to recover and administer assets stolen by Mr. Barkany and which holds a judgment against Mr. Barkany and his entities in excess of $66 million (the "Judgment").

We are writing with respect to Mr. Barkany's request submitted to the Court by letter dated June 26, 2014, for permission to travel to California. For the reasons set forth below, we respectfully urge the Court to deny this and any other similar requests.

    1.    Mr. Barkany's claim to be cooperating with his creditors and working to accomplish restitution is, in our view, a fabrication. Although Mr. Barkany did spend considerable time with us prior to his arrest, he never ceased his dishonest conduct. We subsequently learned that the "cooperation" provided by Mr. Barkany was, at best, selective and that Mr. Barkany concealed assets and bank accounts and repeatedly violated the commitment he made to our clients to discontinue his fraudulent activities.

    2.    Our recent efforts to obtain even basic assistance from Mr. Barkany have repeatedly been rebuffed with refusals and false information. Mr. Barkany seems to have an endless amount of time to solicit new investors whom he claims will enable him to repay our clients. However, he has stonewalled our recent efforts to recover assets and protect our clients' interests. Even if he manages to deliver such funds, we have very serious concerns as to their real source.

    3.    Mr. Barkany has used his freedom to harass former investors and acquaintances including our clients. We view credibly and with great concern the rumors being brought to our

Atlanta, Austin, Chicago, Dallas, Hong Kong, Houston, London, Los Angeles, New Orleans, New York, Sacramento, San Francisco, Washington DC

Judge Leonard D. Wexler
June 27, 2014
Page 2

attention that Mr. Barkany has recently approached potential investors using an alias rather than his real name.

4.      We are also concerned that Mr. Barkany is a serious flight risk. A substantial amount of the money Mr. Barkany stole from our clients remains unaccounted for and our ongoing investigation (which we started in December 2010) leads us to believe that these funds were secreted by Mr. Barkany and/or others who have aided his activities. Although we discovered early in our investigation that Mr. Barkany transferred several million dollars to various relatives and other parties in Israel (and may also have sent funds to Ukraine) for no consideration, information that we recently discovered suggests that he withheld a substantial additional amount of our money and that he may have transferred substantial additional funds to Israel and other jurisdictions. In addition, relatives of Mr. Barkany have provided him with substantial financial support for at least several years and will likely continue to do so regardless of where he is.

To be sure, Mr. Barkany did initially ostensibly "assist" our efforts to recover certain assets - low hanging fruit. However, his representation to the Court that he has made $30 million of restitution is utterly false and the overwhelming share of our Judgment remains outstanding. Our clients have no confidence in Mr. Barkany's alleged efforts to repay them and view any request that he be allowed to leave the immediate New York area as a serious mistake.

We have not taken a position heretofore because our clients had hoped (perhaps unrealistically) that Mr. Barkany had truly reformed himself following his arrest and that he would provide genuine cooperation to his victims. Unfortunately, it is now evident that he remains precisely the same criminal that he has always been.

Respectfully

Alan H. Katz