Lester M. Kirshenbaum, Esq.
Jonathan M. Agudelo, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689
E-mail:  lester.kirshenbaum@kayescholer.com
        jonathan.agudelo@kayescholer.com

**Hearing Date and Time: September 16, 2014 at 10:00 a.m.**

*Attorneys for Petitioning Creditor Joseph
Rosenberg*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re:                                           :
                                                 :        **Chapter No. 8-14-72941-las**
                                                 :
**GERSHON BARKANY,**                             :        **Chapter 7**
                                                 :
                                                 :
                    **Alleged Debtor.**          :
-------------------------------------------------------------x

<u>**MEMORANDUM OF PETITIONING CREDITOR JOSEPH ROSENBERG IN OPPOSITION
TO MOTIONS FILED BY BARKANY AND BARKANY ASSET RECOVERY AND
MANAGEMENT LLC TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION**</u>

TO THE HONORABLE LOUIS A. SCARCELLA, UNITED STATES BANKRUPTCY JUDGE:

Joseph Rosenberg, a petitioning creditor in the above-captioned bankruptcy (and with

Marina District Development Co., LLC, and Saul Kessler, collectively, the "Petitioning

Creditors"[1]), by his undersigned counsel, hereby submits this opposition (the "Opposition") to (i)

the Alleged Debtor's *Motion to Dismiss Bankruptcy Case* [D.I. 13] (the "Barkany Motion to

Dismiss") and (ii) Barkany Asset Recovery and Management LLC's *Motion for Order*

---

[1] The undersigned is authorized to represent that Marina District Development Co., LLC and
Saul Kessler join in this Opposition in its entirety.

*Dismissing Case Pursuant to 11 U.S.C. §§ 105(a), 303(b), 305(a) and 707(a)* [D.I. 15] and related documents thereto[2] (the "Locke Lord Motion"), and together with the Barkany Motion to Dismiss, the "Motions to Dismiss") and respectfully states as follows:

## FACTUAL BACKGROUND

1.      The facts and circumstances present here make this the quintessential case for the Bankruptcy Court's oversight and administration.   The use of the bankruptcy processes is to locate and recover a debtor's assets, investigate and determine the validity and amounts of claims, determine and recover avoidable transfers on a fair and consistent basis, determine issues relating to the equitable subordination of claims, and ultimately oversee the fair and pro rata distribution to creditors of monies obtained through the liquidation and monetization of the Barkany assets.   Some of those primary facts which mandate that this case remain in bankruptcy are summarized below.

2.      Upon information and belief, the Alleged Debtor, Gershon Barkany ("Barkany"), began his Ponzi scheme during 2008 or 2009, and continued that scheme through early 2013. There were quite a number of persons who "invested" with Barkany, and many transactions during that time.   For example, Gerald Pinsky ("Pinsky"), one of the creditors within the Locke Lord Creditor Group (defined below), testified to having invested in 13 separate Barkany "investments" between 2008 and 2010 and having received a substantial "profit" on each of the first ten of those investments.

---

[2]More specifically, the (i) *Memorandum of Law in Support of Motion for Order Dismissing Case Pursuant to 11 U.S.C. §§ 105(a), 303(b), 305(a) and 707(a)* [D.I. 17]; (ii) *Declaration of S. David Belsky* and exhibits thereto [D.I. 18] and (iii) *Declaration of Alan H. Katz* and exhibits thereto [D.I. 19].

3. In late November 2010, Barkany had meetings with a number of investors in his then-open "deals" including, *inter alia*, Abraham Grohman ("Grohman"), Pinsky, Pinsky's wife (who serves as Trustee for the Jason Botnick Trust), and Jordan Most ("Most"). Barkany informed those creditors that he had engaged in a Ponzi scheme, and that he was unable to repay them on their outstanding investments. Those Barkany creditors then retained Locke Lord LLP ("Locke Lord") and an accountant named S. David Belsky ("Belsky") to represent them in their efforts to recover their outstanding investments with Barkany. The creditors who were and remain represented by Locke Lord beginning in late November 2010 include Cortland Realty Investments LLC, which was (and remains) owned and controlled by Grohman, Most, Seth Farbman, Pinsky, Mordechai Hellman, Moshe Schreiber, Shalom Maidenbaum, Charles Silberberg ("Silberberg") and Dekel LLC (collectively, the "Locke Lord Creditor Group").

4. Pinsky, Silberberg and Grohman were recently deposed in an action pending in New York Supreme Court, Nassau County entitled *Mr. San LLC v. Zucker & Kwestel*. During their respective depositions, Pinsky, Silberberg and Grohman admitted that they had invested in numerous Barkany "deals" prior to mid-2010, for which they received full payment on their principal "investments," and also were paid substantial "profits." Grohman also testified that Most had earned substantial profits on many investments that Most had made with Barkany, and that Most was the person who recommended that Grohman (acting through Cortland Realty) should invest with Barkany. The Petitioning Creditors are not aware of any other depositions that have been taken of other persons within the Locke Lord Creditor Group. However, it may well be the case that many, and perhaps all, of the members of the Locke Lord Creditor Group received profits on investments with Barkany between 2008 and early 2010.

5.      It also is important to note that, upon information and belief, beginning in late November 2010 and continuing for many months thereafter, Barkany, by himself and without any legal representation, regularly met with Locke Lord and Belsky, and turned over all of his records to them.  **Upon information and belief, Barkany has also turned over to Locke Lord and to Belsky cash, real estate holdings, securities and other assets with an aggregate value of somewhere between $22 Million and $32 Million for the benefit of the Locke Lord Creditor Group.**

6.      In fact, in a June 27, 2014 letter to District Judge Wexler in Barkany's criminal case, Michael Jannuzzi, one of Barkany's attorneys, in responding to a letter from Locke Lord earlier that day (discussed in more detail below), represented the following concerning Barkany's transfer of assets to Locke Lord in early 2011:

> To be candid, the Locke Lord firm has been the only party guilty of "stonewalling" progress in matters relevant to this Court.  Specifically, while unrepresented by counsel and prior to his arrest, Mr. Barkany turned over to the Locke Lord firm tens of millions of dollars in various assets.  At the time these assets were received by the Locke Lord firm, no value was assigned to the same. While this is deeply troubling for obvious reasons, additional concerns were raised as the Locke Lord firm has made inconsistent statements concerning the value of these same assets.  After several months of pressing for an accounting of these assets, I was provided with a grossly incomplete schedule which, as was acknowledged by the Locke Lord firm, failed to report approximately ten million dollars in real estate turned over to the control of the Locke Lord firm.

7.      In a second letter to Judge Wexler on June 27, 2014, Barkany's criminal counsel, Bruce Barket, responded to Locke Lord's letter, in part, as follows:

> The Katz letter is an ill-advised and very clumsy attempt to retaliate against Mr. Barkany because Katz wrongly believes Mr. Barkany was complicit in the bankruptcy filing and is an attempt to force Mr. Barkany to give Katz' client preference over the other investors.

8.      In that same letter, Mr. Barket reported that Barkany's most recent asset transfer to the Locke Lord Creditor Group occurred in late 2013, when Barkany transferred $1.2 Million in Barkany tax refunds to Locke Lord.

9.      The clear statements from Barkany's lawyers that the Locke Lord Creditor Group is sparing no effort to favor itself at the expense of Barkany's other creditors is simply a repeat of statements made by Locke Lord itself.  For example, in a June 11, 2014 email from Shalom Jacob of Locke Lord to Mr. Jannuzzi, Mr. Jacob stated the following:

> His [*i.e.* Barkany's] primary obligation is to our clients [*i.e.* the Locke Lord Creditor Group] and he will not dictate how he satisfies this obligation.

10.     In early 2011, the Locke Lord Creditor Group asserted its control over Barkany and his assets in other significant ways as well.  During that time, Barkany, acting without legal representation, agreed to sign a very extensive and comprehensive confession of judgment drafted by Locke Lord under the caption of a New York Supreme Court, Queens County ("Queens Supreme Court") action titled *Cortland Realty Investments LLC v. Gershon Barkany* (the "Cortland Realty Action"), which Barkany executed on August 1, 2011 (Exhibit 1).[3] However, instead of publicly filing this Confession of Judgment in Queens Supreme Court in August, 2011, the Locke Lord Creditor Group held that Confession of Judgment for over 20 months, thus keeping everyone other than the members of the Locke Lord Creditor Group unaware of Barkany's fraudulent business activities.  During these 20 months, the Locke Lord Creditor Group exercised complete, unfettered, and unsupervised dominion and control over all of Barkany's assets.  As a result of its failure to file the Barkany Confession of Judgment for

---

[3] References to exhibits herein are to the exhibits to the *Declaration of Jonathan M. Agudelo* (the "Agudelo Declaration") dated September 9, 2014, which is submitted in support of this Opposition.

almost two years, the Locke Lord Creditor Group enabled Barkany to continue his Ponzi scheme for an additional 20 months.

11.      It was not until March 25, 2013, two days before the U.S. Attorney for the Eastern District of New York commenced a criminal case against Barkany, that the Locke Lord Creditor Group obtained an index number in the Cortland Realty Action, filed the Barkany Confession of Judgment, and obtained a judgment against Barkany in the amount of $58 Million, together with $8.6 Million in interest and costs (the "Cortland Realty Judgment").

12.      Upon information and belief, the $58 Million Confession of Judgment to the Locke Lord Creditor Group which was drafted by Locke Lord and executed by Barkany did not take into account the substantial profits earned by the individual members of the Locke Lord Creditor Group on many of their earlier investments with Barkany.

13.      The Petitioning Creditors do not know the specific actions that have been taken by the Locke Lord Creditor Group to liquidate the assets turned over to them by Barkany in early 2011.  What is known is that on August 27, 2013, the Locke Lord Creditor Group filed a Partial Satisfaction of Judgment in the amount of $10,066,000 on the docket in the Cortland Realty Action (Exhibit 2).

14.      Recently, and as mentioned in part above, Locke Lord and counsel to Barkany sent a series of letters to District Judge Wexler on June 27 and June 30, 2014 (copies attached as Exhibit 3), which contained a litany of charges and countercharges against each other.  In Locke Lord's June 30 letter, Locke Lord admitted that the value realized from the assets transferred to it by Barkany exceeded $22 Million, while Barkany's counsel claimed that the value of those assets is over $32 Million.

15.      Moreover, in Locke Lord's June 27 letter to Judge Wexler, Locke Lord asserted that it believes that Barkany had transferred substantial sums of money to various overseas jurisdictions (including, possibly, the Ukraine) which remain unaccounted for.  Also, in both its June 27 and June 30 letters, Locke Lord asserted that Barkany's "dishonest" conduct was ongoing and that Barkany was engaged in efforts to "interfere with our clients' efforts to recover their money . . ."

16.      While the foregoing facts and circumstances more than amply establish the need for proceeding with alacrity with the Barkany bankruptcy case in order to collect and marshall assets, there is much more.  For example, at the present time there are at least 9 litigations that have been commenced by the members of the Locke Lord Creditor Group which are pending in various courts throughout New York (and at least one action in Israel) to avoid and recover alleged fraudulent conveyances for their own benefit (the "Locke Lord Creditor Group Litigations").  The defendants in those litigations largely consist of (i) Barkany investors from earlier deals who allegedly received payment on their "investments", (ii) charitable institutions that received contributions from Barkany, and (iii) a number of lawyers and law firms who were connected with some of Barkany's transactions, or were involved in transferring funds for Barkany.[4]  **It strains credulity that the Locke Lord Creditor Group has asserted multi-million dollar claims to avoid and recover both principal and profit payments received by numerous other Barkany investors, while at the same time attempting to retain the many**

---

[4] One of the Petitioning Creditors, Marina District Development Company, LLC ("Borgata") does not fall into any of those categories.  Borgata is an Atlantic City casino at which Barkany gambled extensively as recently as March 2013.  Barkany has an outstanding debt to Borgata in the approximate amount of $240,000.  Nevertheless, Borgata has been sued by the Locke Lord Creditor Group to recover all of the funds gambled by Barkany at Borgata over a period of years.

**millions of dollars in principal and profits received by the individual persons within the Locke Lord Creditor Group. It would also be patently unfair if the Locke Lord Creditor Group was using the proceeds of Barkany's previous asset transfer to it to finance the Locke Lord Creditor Group Litigations against other Barkany investors.**

17.    In addition to all of the Locke Lord Creditor Group Litigations, there are at least two litigations that have been commenced by other persons who were allegedly defrauded by Barkany during the period of 2012 and early 2013 – after Barkany had signed the Confession of Judgment in favor of the Locke Lord Creditor Group – which are pending in New York Supreme Court. The categories of the defendants in these two litigations are similar to, and in some respects overlap with, the defendants in the Locke Lord Creditor Group Litigations. Plaintiffs' counsel in both lawsuits is Goldberg & Rimberg PLLC. The plaintiff in one of those two litigations is Canadian Northern Realty LLC, on behalf of itself and its members. A chart listing all known pending litigation asserted by the Locke Lord Creditor Group or the creditor group represented by Goldberg & Rimberg PLLC is attached as Exhibit 4 to the Agudelo Declaration.

**I.    Prior Proceedings In This Bankruptcy Case**

18.    On June 25, 2014, the Petitioning Creditors filed an involuntary bankruptcy petition against Barkany in order to provide sanity, order, fairness, uniformity of treatment and transparency to a Barkany creditors' recovery process that has been out of control since the commencement of litigations by the Locke Lord Creditor Group. As discussed further below, only Barkany, the Alleged Debtor, had standing to file an answer contesting the involuntary petition. Barkany failed to file an answer to the involuntary petition, and thus conceded the presence of all facts necessary to proceed with this bankruptcy case (with one caveat discussed below).

19.    On August 13, 2014 Barkany filed a motion pursuant to Section 305 of the Bankruptcy Code asking this Court to dismiss or abstain from this bankruptcy case as a matter of discretion.    Barkany offered three primary arguments in support of his motion to dismiss. Barkany's first assertion for dismissal was that since 2010 he had repaid **several** of his creditors (*i.e.*, the Locke Lord Creditor Group) assets valued in excess of $22 Million.    Barkany's second argument was that most of his creditors had expressed disapproval of the bankruptcy case and therefore the bankruptcy case should not be continued.    Barkany's third argument was that he is acting as a consultant to an unidentified oil and gas company which will generate tens of millions of dollars in profits to him over the next number of years which will, in turn, allow him to pay back his creditors in full.    Thus, Barkany claimed, there is no need for the bankruptcy case. Finally, while Barkany did not directly challenge the existence or amount of his debt to Borgata, Barkany represented that his counsel told him that the Locke Lord Creditor Group claimed that Borgata's claim is "incorrect."    Barkany suggested that if the Locke Lord Creditor Group's assertion was correct, then the involuntary petition should be dismissed because it lacked the required number of petitioning creditors.    The Barkany Motion to Dismiss was accompanied by Barkany's declaration, filed under penalty of perjury, which repeated the various points and representations set out in the bankruptcy motion (the "Barkany Declaraton").

20.    On August 18, 2014 the Locke Lord Creditor Group filed a second motion to dismiss this bankruptcy case.

21.    In its motion to dismiss, Locke Lord repeated all of Barkany's arguments. However, the Locke Lord Creditor Group's two primary arguments were directed to challenging the legitimacy of each of the Petitioning Creditor's claims against Barkany, and arguing that the involuntary petition was filed in bad faith.

22.     The Locke Lord motion was accompanied by Belsky's 26 page Declaration. Virtually the entire Belsky Declaration is devoted to attacking the legitimacy of the Petitioning Creditors' claims.

**II.     Discovery Taken And Attempted To Be Taken By The Petitioning Creditors Subsequent To The Filing Of The Motions To Dismiss.**

23.     Promptly after receiving the two motions to dismiss, the Petitioning Creditors served deposition notices upon Barkany, upon Belsky and upon Grohman.  While Locke Lord indicated that they did not (and indeed have no basis to) challenge the Petitioning Creditors' right to depose Belsky, Locke Lord objected to producing Grohman, and Locke Lord indicated that Belsky will not be produced for deposition until all discovery related disputes between the parties have been resolved.  As discussed further below, at this juncture the Petitioning Creditors have not been given the opportunity to examine Belsky or to obtain any other discovery from the Locke Lord Creditor Group with respect to the pending motions to dismiss.

24.     Barkany appeared for deposition on August 27, 2014.  His 147 page deposition transcript is being filed in its entirety together with this Opposition (Exhibit 5).  During the course of Barkany's deposition, Barkany, with the exception of answering a few questions relating to his current residence and a summary of his current living expenses, asserted his Fifth Amendment constitutional privilege and refused to answer virtually all other questions. Moreover, Barkany declined to answer every question relating to his motion to dismiss the bankruptcy case, and to his own Declaration that he had executed under the penalty of perjury on August 13, 2014 in support of his motion to dismiss (the "Barkany Declaration").  Indeed, Barkany even declined to answer whether he signed his declaration or whether he had even seen his declaration or his motion to dismiss prior to his deposition.  These facts, standing alone,

require that Barkany's motion to dismiss shall be summarily denied,  and that Barkany's bankruptcy case should proceed forthwith.

25.     As further discussed below, the Locke Lord Motion is premature, at best, and should not go forward until after the order for relief is entered in this case.  Further, the Locke Lord Motion may not proceed under any circumstances until after the Petitioning Creditors are afforded the opportunity to take full discovery of the Locke Lord Creditor Group.  However, there is no need for delay.  The record before this Court establishes that the Locke Lord Motion is without all merit, and therefore it should be summarily rejected.

## ARGUMENT

**I.      Barkany's Motion to Dismiss Must Be Denied Because He Asserted the Fifth Amendment Privilege With Respect to Every Assertion Contained in His Motion to Dismiss and in His Declaration**

26.     As discussed above, in his August 13 motion to dismiss, Barkany conceded that the statutory bases for continuing with this bankruptcy case exist.  He simply asked this Court to dismiss the case as a matter of discretion.  In light of Barkany's refusal to answer any questions concerning the claims and assertions set forth in his motion, and in the Barkany Declaration in support thereof, his motion must be denied.

27.     As a threshold matter, when a party invokes the privilege against self-incrimination, the court must first determine whether the assertion was proper.  "A debtor's mere statement that the requested information may tend to incriminate him is not sufficient to entitle him to invoke the Fifth Amendment*." In re Wincek*, 202 B.R. 161, 165 (Bankr. M.D. Fla. 1996) *aff'd*, 208 B.R. 238 (M.D. Fla. 1996).  The debtor has the burden to present "credible reasons why responding to the questions would pose a real threat of incrimination." *In re Connelly,* 59 B.R. 421, 434–35 (Bankr. N.D .Ill. 1986).

28.     This rule is of special significance in the bankruptcy context, where "full disclosure of all relevant information has always been an important policy." *Id.*

29.     In this case, Barkany has not justified his assertion of the Fifth Amendment privilege.  His statements at his deposition consisted of the mere assertion that "my response may tend to incriminate me."  Not once during the course of his deposition – in which he asserted the privilege in response to all but a number of preliminary questions and questions about his current residence and living expenses – did Barkany, individually or through his counsel, allege the grounds for invoking the privilege.  Indeed, in response to the Petitioning Creditors' request that Barkany's counsel elaborate on the basis for assertion, his counsel would not.

A.    Barkany May Not Use the Fifth Amendment Privilege as Both a Sword and a Shield

30.     Moreover, even if Barkany's invocation of the privilege was proper, the Barkany Declaration should be excluded and the Barkany Motion to Dismiss be denied.  In this Circuit, a court evaluating the propriety of striking the testimony of a party that has asserted the privilege against self-incrimination must "consider the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to opposing parties in determining an appropriate outcome." *S.E.C. v. Hirshberg*, 173 F.3d 846 (2d Cir. 1999).

31.     The testimony of a party asserting the privilege can be excluded if the potential for harm or prejudice to the adversary outweighs the need for invoking the privilege.  There has been a sufficient showing of prejudice when "the protective shield of the Fifth Amendment . . . [is] converted into a sword. *U.S. v. Hasting*, 461 U.S. 499, 515 (1983).  This occurs when "a litigant . . . maintain[s] a position while refusing to furnish basic discovery of it." *S.E.C. v. Benson*, 1985 WL 1308, at *2 (S.D.N.Y. Apr. 9, 1985) (precluding defendant from "offering evidence in support of the positions whose basis he refused to disclose" where assertion of

privilege prevented adversary from discovering the factual basis for denials and affirmative defenses).

32.    Numerous courts have stricken a party's testimony where the party's assertion of privilege prevents that testimony from being cross-examined. *United States v. Talco Contractors, Inc.,* 153 F.R.D. 501, 506 (W.D.N.Y. 1994) ("direct testimony may be stricken when the witness invokes the privilege on non-collateral matters" and prevents cross-examination of his direct testimony); *In re Inflight Newspapers, Inc.,* 423 B.R. 6, 16 (Bankr. E.D.N.Y. 2010) (striking defendant's affidavit in support of summary judgment containing factual assertions that were responsive to questions he refused to answer at deposition); *S.E.C. v. Hirshberg,* 173 F.3d 846 (2d Cir. 1999) (refusing to admit defendant's affidavit submitted to defeat summary judgment).

33.    Invoking the privilege in the bankruptcy context is especially prejudicial when it withholds "essential" information that "prevents the administration of [the] Bankruptcy case." *In re Wincek,* 202 B.R. 161, 169.  Indeed, where a debtor makes an assertion as to the merits of the bankruptcy case, but asserts the privilege in response to cross-examination of "any and all further questions" such that he precludes inquiry into the details of his direct testimony and deprives the adversary "of the ability to test the truth" of the testimony, he creates "a substantial danger of prejudice." *Matter of Bergsieker,* 30 B.R. 757, 759 (Bankr. W.D. Mo. 1983) (striking debtor's direct testimony where he subsequently invoked the Fifth Amendment privilege as to all of his previous assertions).

34.    Therefore, although "a witness has the right to decline to answer questions on the basis of the Fifth Amendment," his assertion "is not a substitute for evidence that would meet the burden of production." *Id.*  Furthermore, a party cannot "selectively assert his Fifth Amendment

privilege [in an] attempt[] to insure that his unquestioned, unverified affidavit would be the only version. . . . the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a . . . motion." *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) (striking debtor's affidavit in support of summary judgment where debtor alleged facts that were responsive to deposition questions where debtor asserted the Fifth Amendment privilege). *See also, United States v. Private Sanitation Indus. Assoc*, 914 F. Supp. 895, 900 (E.D.N.Y 1996) (prohibiting witness from relying on direct testimony where "repeated assertion of the Fifth Amendment has . . . undoubtedly given him a 'strategic advantage' over his opposing party").

35.    Barkany invoked the Fifth Amendment privilege in responding to the vast majority of the nearly one hundred and fifty questions put to him during his deposition, including questions about his motion to dismiss and the declaration in support, foreclosing cross-examination of his testimony or legal positions.    The obvious resulting prejudice to the Petitioning Creditors is severe.

36.    Moreover, in moving a court to dismiss this properly filed bankruptcy case, Barkany has the burden to prove that there are compelling grounds to dismiss this case.  By raising the Fifth Amendment privilege, Barkany seeks to avoid his burden in the entirety. Therefore, Barkany's Motion to Dismiss must be denied without consideration of the arguments that Barkany raised in his motion. *See, United States v. One Parcel of Real Prop. Commonly Known as 901 N.E. Lakewood Drive, Newport, Or.*, 780 F. Supp. 715, 721 (D. Or. 1991); *United States v. Private Sanitation Indus. Assoc*, 914 F. Supp. 895, 900 (E.D.N.Y 1996).

## II.    Even If The Arguments Raised By The Barkany Motion Were To Be Considered, They Are Without Any Factual Basis

### A.    Barkany's Various Arguments in Favor of Discretionary Dismissal of this Case Are Without Basis

37.    Barkany's first argument in support of dismissing this case is astounding.  He argues that this bankruptcy case should be dismissed because he has transferred to the Locke Lord Creditor Group assets with a value of over $22 million.  This is a *non-sequitur*.

38.    The fact that the record establishes that Barkany, while not represented by counsel, agreed to execute a $58 million Confession of Judgment to a small number of creditors, and then transferred to that select group assets valued at between $22 million and $32 million is a compelling reason to keep this case in bankruptcy, not to dismiss it.

39.    Barkany's second argument is equally without merit.  Barkany asserts in paragraph 6 of his Declaration:

> The majority of my creditors seek to continue the efforts [*i.e.*, the payments and transfers of assets to the Locke Lord Group] and have expressed disapproval of the Bankruptcy Case.

40.    Even if this statement was factually correct, it is wrong as a matter of law. Bankruptcy law is not based on or guided by the principal of tyranny of the majority.  The guiding bankruptcy principles are to investigate, identify, and obtain possession over all of a debtor's assets, and then to liquidate those assets for equitable and pro rata distribution among all of the debtor's creditors whose claims have been vetted and allowed pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules.

41.    In fact, the Locke Lord Creditor Group's significant control and influence over Barkany and his assets, together with conduct that could rise to the level of being inequitable, raises serious questions about whether its claim should be equitably subordinated.  *See e.g., Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns)*, 554 F.3d 382, 412-13 (3d Cir. 2009)

(affirming bankruptcy court decision equitably subordinating creditor's claim where, among other things, creditor (i) bullied and threatened debtor into taking actions designed to benefit it at debtor's expense and (ii) manipulated the timing of a public notice of the debtor's dire financial straits until after creditor took assets out of debtor and other parties had supplied new equity into failing company); *9281 Shore Road Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Road Owners Corp.)*, 187 B.R. 837, 854-55 (E.D.N.Y. 1995) (improper to dismiss bankruptcy case containing, among other things, equitable subordination claim against alleged insider, since equitable subordination is exclusively a bankruptcy court remedy).

42.    Moreover, the assertion that a majority of Barkany's creditors oppose the bankruptcy and favor the continuation of the existing process simply is incorrect.  It is fair to say that hardly any one (and perhaps no one) other than the persons within the Locke Lord Creditor Group and Canadian Northern Realty, and their respective counsel, support the continuation of the current process.

43.    On the other hand, in addition to these Petitioning Creditors at least 9 other Barkany creditors have filed pleadings urging this Court to reject the Motions to Dismiss and move forward with the Barkany bankruptcy case.

44.    Barkany's third argument in support of his motion to dismiss fares no better than his first two arguments.  Barkany, an admitted felon and fraudster, who confessed in 2011 to having conducted a Ponzi scheme, and then apparently continued his Ponzi scheme for another two years thereafter, argues that there is no need for a bankruptcy because he has a consulting arrangement with an unnamed oil and gas company that will earn him tens of millions of profits over the next few years which will enable him to repay his creditors in full.  The "pie in the sky" nature of this argument is so blatant, that to comment on it would give it more credit than it

deserves.   The Petitioning Creditors do note, however, that if there is any truth to Barkany's representations relating to his expected future income, a bankruptcy case is essential to facilitate a fair repayment process in the most efficient and economical way.

45.    Finally, Barkany while not personally denying the validity of Borgata's claim (which would constitute perjury), notes that if the Locke Lord Creditor Group is successful in challenging Borgata's claim then there will only be two valid petitioning creditors.

46.    This argument fails for 2 reasons.   First, as a matter of law, and as discussed further below, only Barkany has standing to challenge Borgata's claim.   The Locke Lord Creditor Group has no legal standing to do so.   Second, Borgata has filed a  separate submission with this Court which fully establishes the validity of Borgata's non-contingent, undisputed, liquidated claim against Barkany in the amount of $240,000.

**III.    While The Locke Lord Creditor Group Motion To Dismiss Should Not Proceed In Any Event Until After The Order For Relief Is Granted And After Submitted To Full Discovery That Motion Is Without Legal Or Factual Basis And Should Be Summarily Rejected.**

    A.  Section 303 Of The Bankruptcy Code And Bankruptcy Rule 1011 Mandate That A Creditor Has No Standing To Respond To An Involuntary Petition

47.    Section 303(d) of the Bankruptcy Code makes clear that "only a debtor, or a partner in a partnership debtor, may file an answer to an involuntary bankruptcy petition."  11 U.S.C.A. § 303(d).  Similarly, Bankruptcy Rule 1011(a) provides that only "[t]he debtor named in an involuntary petition . . . may contest the petition." *Fed. R. Bankr. Proc. 1011(a).*  Defenses and objections to an involuntary petition may be in the involuntary debtor's answer, but "[n]o other pleadings shall be permitted," except that the court may order a reply to an answer.  *Fed. R. Bankr. Proc. 1011(b), (e).*

48.     The rules set forth in Section 303 of the Code and Bankruptcy Rule 1011 are long-standing.  The 1983 Advisory Committee Notes on Rule 1011 observed that Rule 1011 "preserves the features of the former Act and Rule 112 and the Code permitting no response by creditors to an involuntary petition . . . ." *Fed. R. Bank. P. 1011 advisory comm. nn. (1983).  See also, 9-1011 Collier on Bankruptcy P 1011.06* ("In general, the involuntary petition or petition for recognition of a foreign proceeding and the responsive answer or motions filed by the debtor or, in the case of a petition for recognition, a party in interest, are the only pleadings permitted.")

49.     The policy behind these standing rules is particularly on point here.  Prior to 1938, the bankruptcy statute allowed any creditor to oppose an involuntary bankruptcy petition.  In 1938, the Bankruptcy Act was expressly amended to deny this right to creditors.  *In re Earl's Tire Serv., Inc.*, 6 B.R. 1019, 1021-1022 (D.C. Del., 1980).  The legislative history makes clear that the reason for the change was Congress' concern that a creditor's purpose in opposing an involuntary petition often would be to protect a preference or to gain some other unfair advantage at the expense of other creditors.  *Id.  See also, In re New Era Co.,* 115 B.R. 41, 45 (Bankr. S.D.N.Y., 1990) ("a creditor may have an incentive to protect a preference or to gain some unfair advantage at the expense of other creditors, contrary to the policy of requiring an equitable distribution of the debtor's assets among all creditors"); *In re MarketXT Holdings Corp.*, 347 B.R. 156, 160 (Bankr. S.D.N.Y. 2006) ("a creditor is not authorized to contest an involuntary petition because a creditor may have an incentive to protect a preference or to gain some unfair advantage [at] the expense of other creditors") (citing *In re Westerleigh Dev. Corp.*, 141 B.R. 38, 40 (Bankr. S.D.N.Y. 1992)); *In re QDN, LLC*, 363 Fed.Appx. 873, 876 (3d Cir. 2010) ("Congress chose to preclude creditors from opposing involuntary petitions because such opposition invariably was to protect a preference or to gain some unfair advantage at the expense

of other creditors, contrary to the policy of providing equitable distribution of assets among all creditors").

50.     In view of the foregoing, it is not surprising that courts have consistently held that creditors do not have standing to contest an involuntary petition. *See, e.g., Westerleigh Dev. Corp.*, 141 B.R. at 40 ("Pursuant to 11 U.S.C. § 303(d), an answer to an involuntary petition may be filed by the debtor, or a general partner in a partnership debtor that did not join in the petition . . . . A creditor is not authorized to contest an involuntary petition . . . ."); *In re MacFarlane Webster Assocs.*, 121 B.R. 694, 700 (Bankr. S.D.N.Y. 1990) ("The Code provides only that an alleged debtor can file an answer to an involuntary petition.") (citation omitted); *In re Jr. Food Mart of Arkansas, Inc.,* 234 B.R. 420, 421 (Bankr. E.D. Ark., 1999) ("The Bankruptcy Code and Rules unambiguously provide that, other than in the partnership situation, only the debtor named in the involuntary petition may 'contest' the petition. That is, only the debtor may file a responsive pleading . . . .").

        B.   <u>Case Law Makes Clear That A Creditor Has No Standing To Challenge An Involuntary Petition On The Grounds That The Petition Failed To Satisfy The Requirements of Section 303(b) of the Code</u>

51.     Consistent with the rule that creditors do not have standing to file an answer to an involuntary petition, courts have regularly held that creditors may not move to dismiss a bankruptcy case on the grounds that the petitioning creditors had no standing to initiate the case. *See, e.g., MarketXT Holdings Corp.*, 347 B.R. at 160 (creditor moved to dismiss bankruptcy case initiated by an involuntary petition on the grounds that there was no claim that was not contingent as to liability or the subject of a bona fide dispute; court denied the motion holding that "the sufficiency of an involuntary petition may only be challenged by the debtor and not by creditors or third parties"); *New Era Co.,* 115 B.R. at 44 (creditor moved to dismiss bankruptcy

case initiated by an involuntary petition on the grounds that petitioner was not really a partner of debtor and therefore could not bring petition under Section 303(b); court denied the motion holding that "answers to involuntary partnership petitions may only be filed by the debtor, or a general partner in the partnership that did not join in the petition, as expressed in 11 U.S.C. § 303(d)"), *aff'd*, 125 B.R. 725 (S.D.N.Y. 1991); *In re Global Ship Systems*, 391 B.R. 193, 201 (Bankr. S.D. Ga. 2007) (creditor moved to dismiss bankruptcy case initiated by an involuntary petition on the grounds that the petition was not filed by the requisite three creditors required under Section 303(b); court denied the motion holding that "under longstanding authority, a creditor lacks standing to contest an involuntary petition"); *Earl's Tire Serv., Inc*., 6 B.R. at 1022 (creditor brought complaint seeking dismissal of bankruptcy case initiated by an involuntary petition on the grounds that the petition was not properly commenced under Section 303(b) because petitioner either knew or should have known that debtor had more than 12 creditors; and court denied the complaint holding that creditor "has no right to plead defects" in the petition). *See also, In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839 (Bankr. D.N.J. 2011).

52.     The Locke Lord Creditor Group vainly attempts to avoid this clear rule, by arguing that any question as to its standing is mooted because Barkany moved for dismissal, citing *In re Kenval Marketing Corp.*, 38 B.R. 241 (Bankr. E.D. Pa. 1984) for support.   The *Kenval* case is completely inapposite, and is of no help to the Locke Lord Creditor Group.   The "assignee" in *Kenval* was an assignee for the benefit of the creditors.   An assignment for the benefit of creditors is a statutory-based voluntary transfer by a debtor of substantially all of the debtor's property to an assignee in trust for the purpose of applying the property or its proceeds to the payment of the debtor's entire creditor body.   *6 Am. Jur. 2d § 1.*   An assignee for the benefit of creditors "is not a creditor; rather, he holds the same position as the debtor and

represents the debtor's interests.  He has no personal interest which he may want to promote at the expense of other creditors." *In re A & B Liquidating, Inc.,* 18 B.R. 922, 925 (Bankr. Va. 1982).

53.    In stark contrast to the status of a statutory assignee from the debtor for the benefit of all of the debtor's creditors, the Locke Lord Creditor Group is purportedly an assignee from a select number of the debtor's creditors for the purpose of enforcing and collecting upon the claims of those particular creditors.  The Locke Lord Creditor Group has cited no authority – nor is there any – that supports the startling proposition that the assignee of a creditor's or a group of creditors' claims has standing to contest an involuntary petition under Section 303.  The general rule of law, that an assignee cannot take rights superior to those of its assignors, is applicable here, and warrants the rejection of the Locke Lord Creditor Group's position.

C.    <u>Creditor Motions to Abstain or Dismiss Under Section 305(a) or Section 707(a) of the Code May Only Be Considered After An Order For Relief Has Been Entered</u>

54.    A challenge to an involuntary petition under Section 305(a) or Section 707(a) of the Code may not be brought until after the court has entered an order for relief.  Therefore, the Locke Lord Motion is premature on these grounds, and should be denied.

55.    In *MarketXT Holdings Corp.,* the court held that while creditors have no standing to challenge an involuntary petition under Section 303 of the Code, "[t]here are, of course, grounds on which parties in interest may seek dismissal of any Chapter 11 case *after an order for relief has been entered*," including motions to dismiss or abstain pursuant to Section 305(a). *MarketXT Holdings Corp.*, 347 B.R. at 160 (emphasis added).  *See also, In re T J Ronan Co*, 114 F.Supp. 299, 301 (D.C.N.Y. 1953) ("While I do not pass at this time upon the right of creditors to apply *after adjudication* for an order to vacate the adjudication or for dismissal of the

involuntary petition, the disposition herein is without prejudice to such an application . . . .")
(emphasis added).

56.     Even cases cited by the Locke Lord Creditor Group suggest that dismissal under Sections 305(a) and/or 707(a) may only be sought after an order for relief has been entered.  In one case, *Jr. Food Mart,* the court stated with respect to motions under Sections 305(a) and 707(a) that "[a]lthough the respondents may not contest the involuntary petition within the meaning of section 303 of the Bankruptcy Code *and an Order for Relief, therefore, is appropriate*, the respondents are not precluded from filing or prosecuting a motion to dismiss. . . ." *Jr. Food Mart of Arkansas, Inc.,* 234 B.R. at 422 (emphasis added).

57.     Similarly, *MacFarlane Webster Assocs.*, 121 B.R. 694, cited by the Locke Lord Creditor Group, is of no help to them.  In that case, an order for relief had already been entered before the creditor brought its motion under Sections 707 and 305.[5]

    D.     Even If The Locke Lord Motion Under Section 305(a) or Section 707(a) of the Code
       Is Not Premature, It Should Be Denied

58.     The Locke Lord Creditor Group spends a significant portion of its brief arguing that the Petitioning Creditors filed the Involuntary Petition in bad faith.  As an initial matter, the Locke Lord Creditor Group completely ignores the long-standing authority that makes clear that dismissal of an involuntary petition for bad faith is an extraordinary remedy that may only be

---

[5] In this regard, the facts of *Westerleigh* are unique and are not relevant to the situation here.  In *Westerleigh*, the court reiterated the general rule that under Section 303, a creditor has no standing to contest an involuntary petition.  However, the court then ruled that in the extraordinary situation before it where the debtor was "paralyzed" and unable to answer the petition, then "either shareholder should be afforded standing to contest an involuntary Chapter 11 petition filed against the corporation . . . ." *In re Westerleigh*, 141 B.R. at 40.  The facts in *Westerleigh* were unique – the debtor was unable to answer the petition because "its two shareholders [were] deadlocked in a two-party dispute" – and these facts warranted a flexible application of the general standing rules.

granted after a presumption of good faith is overcome. *See, e.g., U.S. Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc.,* 58 B.R. 1008, 1011 (N.D.N.Y. 1986) ("It is clear, however, that there is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith . . . . In considering petitioning creditors' motivation, courts have generally required nearly unconscionable behavior before finding bad faith"); *In re Reveley*, 148 B.R. 398, 406 (Bankr. S.D.N.Y. 1992) ("[p]etitioning creditors charged with bad faith filings . . . have certain procedural advantages in their favor. First, there is a presumption of good faith on the part of the petitioners, and the objecting party has the burden of proving bad faith. [citation omitted] Moreover, the burden is a heavy one, requiring proof by at least a preponderance of the evidence"). *See also In re Secured Equipment Trust of Eastern Air Lines, Inc.,* 1992 WL 295943, at *6 (S.D.N.Y. 1992); *Forever Green Athletic Fields, Inc.,* 500 B.R. at 425 (Bankr. E.D. Pa. 2013).

59.    The Locke Lord Creditor Group attempts to support its bad faith argument by articulating the *improper* purposes for which an involuntary petition might be filed - and simply ignores the *proper* purposes for which this involuntary petition was filed. Proper purposes for filing an involuntary petition include, but are not limited to, the intent to effectuate an orderly process among all of the debtor's creditors, to resolve inter-creditor disputes, to see the debtor's assets preserved until litigation is resolved, to invoke the protection and supervision of the Court to protect themselves and other creditors, to investigate, account for, and protect the debtor's assets, and to avoid some creditors being preferred over others. *See, e.g., In re Reveley*, 148 B.R. at 409 ("the Petitioning Creditors' primary motivations in filing the involuntary petitions were to prevent any further dissipation of assets occurring either through collateralization agreements with other creditors or litigation and foreclosures instituted by other creditors and to obtain

reliable financial information and control in an effort to facilitate an orderly workout among all the Alleged Debtors' creditors. These are legitimate, commercial purposes and do not constitute bad faith on the part of [the Petitioning Creditors]"); *In re CLE Corporation,* 59 B.R. 583, 584 (N.D. Ga. 1986) (legitimate reasons for a creditor filing an involuntary petition include: "to invoke the protection and supervision of the Court to protect themselves and other creditors; to investigate, account for, and protect the Debtor's assets; and to effect an orderly and effective reorganization of the Debtor under this Court's supervision").

## CONCLUSION

The record before this Court overwhelmingly establishes that the statutory bases for keeping this case in bankruptcy are present, and that there are multiple reasons – of both legal and equitable nature – to proceed with this bankruptcy case. Therefore, the Petitioning Creditors respectfully request that the order for relief be entered and both Motions to Dismiss be denied. Alternatively, the Petitioning Creditors respectfully request that the order for relief be entered forthwith, the Barkany Motion to Dismiss be denied, and a decision on the Locke Lord Motion be deferred until the completion of discovery.

Dated:  New York, New York
          September 9, 2014

KAYE SCHOLER LLP

By:   */s/ Lester M. Kirshenbaum*
Lester M. Kirshenbaum, Esq.
Jonathan M. Agudelo, Esq.
425 Park Avenue
New York, New York 10022-3598
Tel:  (212) 836-8000
E-Mail: lester.kirshenbaum@kayescholer.com
          jonathan.agudelo@kayescholer.com

*Attorneys for Petitioning Creditor Joseph Rosenberg*