UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re

GERSHON BARKANY,

                       Debtor.

-----------------------------------------------------------x

Case No. 8-14-72941-las

Chapter 7

## MEMORANDUM DECISION AND ORDER

The matter before the Court raises the question of whether a permanent trustee elected under 11 U.S.C. § 702 must be a disinterested person and, if so, whether the election candidate in this case, Mark A. Frankel, Esq., is disinterested. Having considered the submissions of the parties, the relevant law, and the record in this case, and for the reasons explained below, the Court concludes that (i) a permanent trustee elected under 11 U.S.C. § 702 must be a disinterested person and (ii) at least insofar as the parties and issues appear in this case at the present time, Mr. Frankel is disinterested and is free of any disabling conflict of interest. This Memorandum Decision and Order constitutes the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure,[1] and memorializes and is consistent with the Court's findings and ruling at the evidentiary hearing held on July 13, 2015.

## I.     INTRODUCTION

Barkany Asset Recovery & Management LLC ("BARM"), Cortland Realty Investments, LLC, Jordan Most, Marshal Eisenberg, Debra Eisenberg Wilder, Seth Farbman, Janet Pinsky, Shalom Maidenbaum, Rachell Gober, The Bosses' Daughter, LLC, Chaim Silberberg and Mr. San, LLC (collectively with BARM, the "BARM Group") and 169 16th Street, LLC, WL Metro Equity Holdings, LLC, L'Chayim Foundation, Inc., Ludvik and Eva Hilman Family Partnership and Law Offices of Allan Lebovits, P.C., as Nominee (collectively, the "Canadian Northern Creditors") each filed a motion seeking confirmation of the election of Mr. Frankel as permanent trustee in this case [ECF Nos. 199 and 200].

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Objections to the eligibility of the BARM Group and the Canadian Northern Creditors to vote at the election were filed by (i) Marc A. Pergament, Esq., Interim Chapter 7 Trustee of the estate of Gershon Barkany, debtor ("Barkany") [ECF No. 206], (ii) Saul Kessler [ECF No. 205], and (iii) Jonathan Zelinger, Ethical Products Inc., Petex International, and Joseph Rosenberg [ECF Nos. 202, 204 and 208], which objection was joined by Jonathon Leifer, Murray Leifer, Sara Leifer and Whitefish Group, LLC [ECF No. 203] and by Alfred Schonberger and Mordechai Shulman [ECF No. 207]. Additionally, Mr. Pergament, as interim trustee, challenged the eligibility of Mr. Frankel to serve as trustee in this case on the ground that Mr. Frankel is not disinterested. The BARM Group and the Canadian Northern Creditors disagree, insisting that Mr. Frankel is disinterested and free of any disabling conflict of interest.

Because the disinterestedness of a professional is an important requirement under the Bankruptcy Code and the applicable rules of professional responsibility, before considering whether those who called for the election and subsequently voted for Mr. Frankel were eligible to vote, the Court determined that it must first consider whether an elected permanent trustee must be disinterested and, if so, whether Mr. Frankel is disinterested. Accordingly, the evidentiary hearing held on July 13, 2015 did not, and this Memorandum Decision and Order does not, address the election controversy. That issue was addressed at an evidentiary hearing held on August 11, 2015 and is the subject of a separate Memorandum Decision and Order issued concurrently with this opinion.

II.    JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer proceedings to a bankruptcy judge under 28 U.S.C. § 157, and this matter is referred here by the Standing Order of Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012, effective *nunc pro tunc* as of June 23, 2011. Venue lies under 28 U.S.C. § 1409. This matter is a contested election of a permanent trustee, and is therefore a core proceeding. 28 U.S.C. § 157(b)(2)(A). A bankruptcy judge may hear and finally decide any core proceeding. 28 U.S.C. § 157(b)(1). A contested election under 11 U.S.C. § 702 "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge.

Stern v. Marshall, 131 S. Ct. 2594, 2618 (2011).  Accordingly final judgment is within the scope of the

Court's jurisdictional and constitutional authority.

III.    BACKGROUND AND PROCEDURAL HISTORY[2]

   A.   Events Leading Up to the Bankruptcy

This bankruptcy case arises from two fraudulent business schemes conducted by Barkany

between 2008 and 2013, by which he induced investors to believe that they were investing in bona fide

real estate ventures.

Between 2008 and 2010, Barkany carried out the first fraudulent investment scheme against

Cortland Realty Investments, LLC, Jordan Most, Seth Farbman, Gerald Pinsky, Mordechai Hellman,

Moshe Schreiber, Shalom Maidenbaum, Charles Silberg, and Dekel LLC (the "Cortland Creditors").

On August 1, 2011, Barkany signed an affidavit of confession of judgment (the "Affidavit of

Confession") with respect to the investment scheme involving the Cortland Creditors.  Based upon his

Affidavit of Confession, a prepetition judgment was entered against Barkany on March 25, 2013 in the

amount of $66,609,420.74 (the "Judgment").  [ECF No. 19-1]. After the Cortland Creditors recovered

$10,066,000.00, a partial satisfaction of the Judgment was entered and the remaining $56,543,424.74

owed under the Judgment was assigned to BARM.  BARM was formed to collect and administer assets of

Barkany by enforcing the Judgment and bringing claims against third parties.  [ECF No. 19-2].  Mr.

Belsky is the sole member and manager of BARM and Locke Lord LLP represents BARM as its legal

counsel.

---

[2] The factual background and procedural history are taken from the pleadings, exhibits, transcripts, and other papers submitted by the parties in the bankruptcy case, including the court's Claims Register.  The Court has taken judicial notice of the contents of the docket in this bankruptcy case.  Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.), 151 Fed. Appx. 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); Levine v. Egidi, No. 93 C 188, 1993 WL 69146 (N.D. Ill. Mar. 8, 1993); MedMal Trust Monitor v. VIII SV 5556 Lender, LLC (In re Saint Vincent's Catholic Med. Ctrs. of N.Y.), 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010) (taking judicial notice of the docket in the underlying bankruptcy case); In re Campbell, 500 B.R. 56, 59 n. 7 (Bankr. D.N.M. 2013) (electing to take judicial notice of the entire file in the case for sake of completeness as a bankruptcy court has the inherent authority to take judicial notice of entries on its own docket).  The Court is also permitted to take judicial notice of publicly-filed documents such as those filed on the dockets of other courts.  Kavowras v. N.Y. Times Co., 328 F.3d 50, 57 (2d Cir. 2003) (noting that courts may take judicial notice of public filings); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts … to establish the fact of such litigation and relating filings.") (internal citations omitted).

In 2013, Barkany perpetrated a second investment scheme against, *inter alia*, the Canadian Northern Creditors by presenting himself as Gary Barr and causing the Canadian Northern Creditors to invest in excess of $8 million in purported real estate ventures.

According to BARM, Mr. Belsky's investigation revealed that, *inter alia*, Joseph Rosenberg (Barkany's father-in-law), Saul Kessler and the Marina District Development Company, LLC a/k/a the Borgata Hotel Casino and Spa (the "Borgata"), received over $10,000,000 from Barkany's fraudulent investment schemes.  In an effort to collect on its Judgement, BARM commenced separate prepetition fraudulent conveyance actions against Mr. Rosenberg on March, 4, 2014,[3] the Borgata on April 23, 2014,[4] and Mr. Kessler on April 29, 2014[5] (collectively referred to as the "BARM Prepetition Fraudulent Conveyance Actions").  Mr. Rosenberg, as well as other recipients of alleged fraudulent conveyances, i.e., Jonathan Zelinger, Ethical Products, Inc., and Petex International Limited ("Petex International"), are represented by Lester Kirschenbaum, Esq. of Kaye Scholer LLP ("Kaye Scholer") in this bankruptcy case.  Mr. Zelinger is the president of Ethical Products, Inc. and the chairman of Petex International.  He is also the brother of Barkany's mother-in-law (i.e., the brother of Mr. Rosenberg's wife).[6]  Mr. Rosenberg, Mr. Zelinger, Ethical Products, Inc. and Petex are referenced collectively as the "Rosenberg Group".

    B.   The Bankruptcy Filing and Events Leading Up to the Election Controversy

On June 25, 2014, Mr. Rosenberg, Mr. Kessler and the Borgata filed an involuntary chapter 7 bankruptcy petition against Barkany.  [ECF No. 1].  Barkany and BARM each filed a motion to dismiss and vigorously contested the involuntary petition for more than six months before Barkany ultimately consented to the chapter 7 filing.  An order for relief was entered on January 14, 2015. [ECF No. 118].

---

[3] See Barkany Asset Recovery and Management LLC vs. Rosenberg, et al., Index No. 650714/2014 (N.Y. Sup. Ct.).

[4] See Barkany Asset Recovery Management LLC v. Marina District Development Co., LLC, No. 1:14-cv-02602 (E.D.N.Y.).

[5] See Barkany Asset Recovery Management LLC v. Kessler, et al., Index No. 154149/2014 (N.Y. Sup. Ct.).

[6] Nov. 13, 2014 Hr'g Tr. 13:3-4 [ECF No. 82].

Thereafter, on January 22, 2015, Mr. Pergament, one of the attorneys on the panel of chapter 7 trustees in this district, was appointed as the interim trustee. [ECF No. 120].  The initial meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting") was scheduled for March 11, 2015. [ECF No. 136].

On March 10, 2015, Locke Lord LLP contacted the Office of the United States Trustee ("U.S. Trustee") and Mr. Pergament to notify them that the BARM Group and the Canadian Northern Creditors will request an election for the permanent trustee at the initial 341 Meeting to be held the next day.  [ECF No. 151].  At the commencement of the 341 Meeting on March 11, 2015, Christine H. Black, Esq., Assistant U.S. Trustee, appeared on behalf of the U.S. Trustee and notified those present that the 341 Meeting would not go forward because the BARM Group and the Canadian Northern Creditors planned to call for an election of a permanent trustee, and because the U.S. Trustee needed additional time to perform administrative functions in preparation for such an election.  As a result, the 341 Meeting was rescheduled for April 22, 2015.

On April 22, 2015, the U.S. Trustee held the rescheduled 341 Meeting and the BARM Group and the Canadian Northern Creditors called for an election and nominated Mr. Frankel to be the permanent chapter 7 trustee.  Objections to the eligibility of the BARM Group and the Canadian Northern Creditors to vote were lodged by Mr. Rosenberg, Mr. Kessler, and a group of contingent creditors.  After these objections were stated for the record, the U.S. Trustee conducted the trustee election.  The BARM Group and the Canadian Northern Creditors voted for Mr. Frankel to become the permanent trustee.  Mr. Kessler[7] and other creditors known as the Whitefish Creditors[8], with the exception of one of its members, the Whitefish Group, LLC who did not file a proof of claim, voted for Mr. Pergament.  The members of

---

[7] While Mr. Kessler's counsel did cast a vote at the 341 Meeting on his behalf, the U.S. Trustee observed that the proxy submitted by counsel was not signed by Mr. Kessler in the presence of a notary, but rather showed a conformed signature and was not notarized as required by Bankruptcy Rule 9010(c). Accordingly, the proxy was incorrectly completed and could not be used to vote at the 341 Meeting.

[8] The Whitefish Creditors consists of Murray Leifer, Sarah Leifer, Jonathan Leifer, Edward Lowy and Whitefish Group, LLC.

the Rosenberg Group could not vote either because they were insiders, held contingent claims or their claims were disputed. No objection or challenge was raised at the 341 Meeting as to Mr. Frankel's eligibility to serve as the permanent trustee, if elected.

      C.   <u>Motions to Resolve the Election Controversy</u>

On May 1, 2015, the U.S. Trustee filed a Report of the Debtor's Chapter 7 Election Controversy (the "<u>Election Report</u>") [ECF No. 187] in accordance with Bankruptcy Rule 2003(d)(2).[9]  In the Election Report, the U.S. Trustee stated, *inter alia*, that on April 23, 2015, the day after the election was conducted, Mr. Pergament sent a letter via email and regular mail to Ms. Black alleging that Mr. Frankel's law firm, Backenroth Frankel & Krinsky (the "<u>Backenroth Firm</u>"), had represented an individual who owed money to the Debtor (the "<u>April 23 Letter</u>").  The April 23 Letter from Mr. Pergament, attached as Exhibit J to the Election Report, references a document provided by BARM's counsel and states:

> As you can see, on the first line, there is a debt that is owed by SSJ Jamal to the Debtor in the sum of $400,000.00 and that BARM did not collect any money from that borrower. Mr. Jamal (sic) was represented by Backenroth Frankel & Krinsky at the deposition in an action commenced by BARM against Southwest Securities. I previously provided you with documentation indicating their representation of Mr. Jamal at a non-party deposition.
>
> I believe that the fact that their client owes money to the Debtor disqualifies Mr. Frankel as the Chapter 7 Trustee.

April 23 Letter. While the U.S. Trustee reported that the trustee election raised several issues requiring resolution by this Court, the issue of whether a candidate elected as permanent chapter 7 trustee is required to be a disinterested person was not raised.

---

[9] Bankruptcy Rule 2003(d)(2) governs the reports of disputed elections, and provides that, "[i]f the election is disputed, the United States trustee shall promptly file a report stating that the election is disputed…."

On May 15, 2015, the Canadian Northern Creditors and the BARM Group filed separate motions to resolve the election controversy in favor of Mr. Frankel in accordance with Bankruptcy Rule 2003(d)(2).[10] [ECF Nos. 199 and 200].  Aside from arguments that its members are eligible to vote for a permanent trustee at the 341 Meeting, the BARM Group challenged the failure of Mr. Pergament or the U.S. Trustee, to the extent the U.S. Trustee was aware of a potential issue regarding Mr. Frankel's candidacy prior to the 341 Meeting, to question Mr. Frankel's disinterestedness at the election so that it could be addressed at that time.  The BARM Group asserted that Mr. Frankel's firm represented Stephen Jemal ("Jemal"), the owner of SSJ Development, LLC, and that Mr. Pergament's conflict of interest argument fails because it rests on two faulty assumptions – first, that the Debtor made a loan to SSJ Development, LLC ("SSJ Development") and second, that Jemal owed money to the Debtor.  According to the BARM Group, the assumptions are incorrect because Pratt Foreclosures, LLC ("Pratt"), in which Barkany owned a one-half interest, made the loan to SSJ Development in 2008, and therefore, the lender was Pratt and not Barkany, and the borrower was SSJ Development and not Jemal. Further, while Jemal did provide a guaranty of the Pratt loan to SSJ Development, his liability under the guaranty was discharged in his personal bankruptcy case on November 2, 2012.

On May 22, 2015, objections to the motions to resolve the election controversy were filed by (i) Mr. Pergament [ECF No. 206], (b) Mr. Kessler [ECF No. 205], and (c) Mr. Rosenberg, Jonathan Zelinger, Ethical Products Inc. and Petex International [ECF Nos. 202, 204 and 208], which objection was joined by the Whitefish Creditors [ECF No. 203] and by Alfred Schonberger and Mordechai Shulman [ECF No. 207].

In his objection, Mr. Pergament asserts that Mr. Frankel has a conflict of interest that precludes his appointment as the permanent trustee even though the loan was made to SSJ Development and not Jemal.  In support of his position, he states that BARM commenced a lawsuit which is currently pending

---

[10] Bankruptcy Rule 2003(d)(2) requires that any party seeking to resolve an election controversy must file a motion "no later than 14 days after the United States trustee files a report of a disputed election…."

before the Supreme Court of the State of New York captioned *Barkany Asset Recovery & Management, LLC v. Southwest Securities, Inc., Leighton Stallones and SSJ Development, LLC*, Index No. 500540/2013 (the "Southwest/SSJ Action"), to recover the loan made to SSJ Development. Although Jemal is not a party to the Southwest/SSJ Action, BARM examined Jemal as a non-party witness and Mr. Pergament contends that he is a key witness because BARM's allegations center on Jemal's assets and finances as factors in Pratt making the loan to SSJ Development. Mr. Pergament acknowledges that he filed a letter agreement dated April 27, 2015 in the Southwest/SSJ Action whereby BARM agreed not to distribute the proceeds of any settlement or judgment in the Southwest/SSJ Action without first providing Mr. Pergament forty-five days' written notice. The notice period would give Mr. Pergament an opportunity to seek such relief as he deems appropriate from this Court with respect to the proceeds. While Mr. Pergament agreed not to intervene in the Southwest/SSJ Action, seek to remove the Southwest/SSJ Action to the Bankruptcy Court, or commence any separate action against the defendants in the Southwest/SSJ Action relating to the same transaction, the agreement is without prejudice to and with full reservation of all rights of the parties. Mr. Pergament's view is that BARM should have inferred from the April 27 letter agreement that he would likely participate in claims against SSJ Development and that he may seek to examine Jemal regarding the loan transaction. Accordingly, Mr. Pergament contends that as permanent trustee, Mr. Frankel would be expected to examine Jemal in connection with the Southwest/SSJ Action, and that gives rise to an appearance of impropriety.

The BARM Group, however, takes a different view. In its May 29, 2015 reply to the Objections, [ECF Nos. 214], the BARM Group contends, *inter alia*, that Mr. Pergament's claim that Mr. Frankel is not disinterested and therefore ineligible to serve as trustee ignores the facts surrounding the loan transaction, the subsequent assignment of the loan to BARM, and the allegations in the Southwest/SSJ Action. In support of its position, the BARM Group submitted the affidavit of Stuart A. Blander, Esq. ("Blander") dated May 21, 2015 ("Blander Aff.") and a supplemental affidavit of Blander dated May 28, 2015 ("Blander Supp. Aff."). In his affidavits, Mr. Blander, an attorney with the firm of Heller, Horowitz & Feit, P.C., BARM's counsel in the Southwest/SSJ Action, explained that while Jemal personally

guaranteed repayment of the loan by Pratt to SSJ Development: 1) the loan and the underlying cause of action were assigned by Pratt to BARM in February 2012 pursuant to an amended assignment, which assignment was executed by both Barkany and Pratt's other co-owner, Leah Schreiber ("Mrs. Schreiber"), and 2) Jemal is not a defendant in the Southwest/SSJ Action due to his bankruptcy discharge. SSJ Development has not appeared in the Southwest SSJ Action even though it is a named defendant, and appears to be defunct and without any assets. Mr. Blander also clarifies that while his colleague, Eli Feit, Esq., did attend a deposition of Jemal, the deposition subpoena was served by Southwest Securities and 98% of the questioning was conducted by Southwest Securities' counsel, not BARM. Furthermore, he notes that BARM does not, at the present time, have any intention of calling Jemal as a witness at trial nor does it expect Jemal to testify on behalf of Southwest Securities. Mr. Blander asserts that the issue in the Southwest/SSJ Action is not the extent of Jemal's assets and finances as it is undisputed that at the time of the loan from Pratt, Jemal and SSJ Development had virtually no assets in the securities accounts. Rather, the issue is whether Southwest Securities may be held liable for misrepresenting and failing to disclose what it knew about Jemal's assets and finances. Lastly, Mr. Blander states that BARM's April 27 letter agreement with Mr. Pergament was not in contemplation of an intervention by the trustee in the Southwest/SSJ Action, but rather served to foreclose the possibility of such intervention.

The Court held a hearing on the motions to resolve the election controversy on June 2, 2015 at which it observed, *inter alia,* that section 702 of the Bankruptcy Code does not expressly require that an elected chapter 7 trustee be disinterested while section 701, which governs the appointment of an interim trustee, and section 1104, which governs the appointment of a chapter 11 trustee, each require that a trustee be a disinterested person. Accordingly, as noted above, before considering the merits of the election controversy, the Court determined that it should first consider whether there is a disinterestedness standard and, if so, the interim trustee's claim that that Mr. Frankel is not disinterested and therefore ineligible to serve as trustee. Moreover, Mr. Frankel was the only person other than Mr. Pergament to receive a vote at the election. If a permanent trustee is required to be disinterested and Mr. Frankel does not satisfy this requirement, then the election controversy would be resolved and Mr. Pergament would

remain the chapter 7 trustee.  For these reasons, the Court (a) directed the parties to submit legal memoranda on the following issues: 1) whether a permanent trustee was required to be disinterested under section 702 of the Bankruptcy Code and 2) if there is a disinterested requirement, whether Mr. Frankel satisfied this requirement, and (b) scheduled a hearing for June 23, 2015.  After legal memoranda were submitted, a hearing was held on June 23, 2015 at which time Mr. Pergament requested that the issue of disinterestedness be set down for an evidentiary hearing, which the Court scheduled for July 13, 2015 ("July 13 Evidentiary Hearing").

At the July 13 Evidentiary Hearing, the BARM Group introduced into evidence the sworn declarations[11] of Moshe Schreiber ("Mr. Schreiber"); Belsky; Mr. Frankel; and Scott A. Krinsky ("Krinsky"), the Blander Aff. and the Blander Supp. Aff. (Exhibits BARM-1 through BARM-3 and BARM-5 through BARM-7), and other documentary evidence, including the Loan Agreement dated November 28, 2008 between Pratt and SSJ Development (the "Loan Agreement") (Exhibits BARM-8 through BARM-11, BARM-13, BARM-15 through BARM-24, BARM-28 and BARM-29).  No objection to the submission of the direct testimony of BARM's witnesses by declaration or affidavit, or to its documentary evidence, was lodged. Mr. Pergament cross-examined Mr. Schreiber and Mr. Belsky, and introduced documentary evidence (Exhibits Interim Trustee A and B).

IV.    FINDINGS AS TO THE PRATT LOAN AND REPRESENTATION OF JEMAL

Based on the testimony and exhibits presented, the Court makes the following findings as to (i) Pratt, (ii) the Pratt loan to SSJ Development (the "SSJ Loan"), (iii) the assignment of the SSJ Loan to BARM, (iv) the Backenroth Firm's prior representation of Jemal, (v) the Southwest/SSJ Action, and (vi) Mr. Frankel.

---

[11] As used herein, "[Witness] Decl." refers to the sworn declaration admitted at the July 13 Evidentiary Hearing containing the direct testimony of the witness identified.

A.  Pratt Foreclosures, LLC and Mr. Schreiber

Pratt is a limited liability company formed in 2008 under New York law.  BARM-1.  Schreiber

Decl., at ¶ 1; Exhibit BARM-2, Belsky Decl., at ¶ 6; Exhibit BARM-28, Articles of Organization; Exhibit

BARM-29, NYS Dept. of State Entity Information.  Its members were Barkany and Mrs. Schreiber, each

of whom owned equal interests in the company.  Tr.[12] 65:18-24; Schreiber Decl., at ¶ 2; Belsky Decl., at ¶

6.  Pratt was intended as a vehicle through which Messrs. Schreiber and Barkany could make loans.  Tr.

82:20-24; Schreiber Decl., at ¶ 2.

Mr. Schreiber ran Pratt's business.  Tr. 84:19–85:10.  Its books and records were maintained in

Mr. Schreiber's office by someone employed by him. Schreiber Decl., at ¶ 2; Belsky Decl., at ¶ 6.  Pratt

had its own bank account and filed its own income tax returns.  Schreiber Decl., at ¶ 2; Belsky Decl., at ¶

6.  Pratt made approximately four loans, including the loan to SSJ Development.  Schreiber Decl., at ¶ 2.

B.  The SSJ Loan

In 2008, Jemal approached Mr. Schreiber about making a loan to SSJ Development.  Schreiber

Decl., at ¶ 3.  Pursuant to the Loan Agreement, Pratt loaned SSJ Development $820,000.  Id.; Exhibit

BARM-8, Loan Agreement.  The Loan Agreement between Pratt and SSJ Development was executed by

Jemal on behalf of SSJ Development and by him as guarantor.  Loan Agreement.  The loan was secured

by a lien on securities in an account maintained by SSJ Development at Southwest Securities.  Loan

Agreement.  Mr. Schreiber represented Pratt in making and collecting the SSJ Loan. Schreiber Decl., at ¶

4.  The funds needed to make the SSJ Loan were provided to Pratt in equal amounts by Mr. Schreiber and

Barkany.  Tr. 85:11-24; Belsky Decl., at ¶ 6; Schreiber Decl., at ¶ 4.  Barkany's involvement was

minimal.  Id.  The SSJ Loan was to be repaid in full by June 1, 2009.  Loan Agreement.  It has not been

paid.

---

[12] As used herein, "Tr." refers to the transcript of the July 13 Evidentiary Hearing [ECF No. 253].

C.  Assignment of the SSJ Loan

In December 2010, Barkany erroneously told BARM that he had lent Jemal $350,000.  Belsky

Decl., at ¶¶ 4-5.  Barkany executed an assignment of that debt to BARM.  Exhibit BARM-9, Assignment

and Assumption of Loan Contract.  BARM subsequently determined that the loan was not as described by

Barkany, but was instead the $820,000 loan from Pratt to SSJ Development.  Belsky Decl., at ¶ 5.  In

February 2012, by amended assignments executed by Pratt, Barkany and Mrs. Schreiber, the SSJ Loan

and all rights concerning it were assigned to BARM.  Exhibit BARM-10, Amended Assignment and

Assumption of Loan Contract executed by Barkany and Pratt Foreclosures; Exhibit BARM-11, Amended

Assignment and Assumption of Loan Contract executed by Mrs. Schreiber; Tr. 76:13-15; Belsky Decl., at

¶¶ 7-9; Schreiber Decl., at ¶ 5.

When questioned by Mr. Pergament at the July 13 Evidentiary Hearing about the consideration

given to Pratt for its assignment of its claims against SSJ Development and Southwest Securities to

BARM, Mr. Schreiber testified that if any money was recovered, he would receive the amount that he had

originally put in and the other half would go into the group's account.  Tr. 76:13-25.

D.  The Role of the Backenroth Firm in Jemal's Bankruptcy Filing

On May 25, 2012, Jemal and his wife filed a voluntary chapter 7 petition in this Court.  Exhibit

BARM-15, Notice of Bankruptcy Case Filing; Exhibit BARM-16, Voluntary Petition.  The main

bankruptcy case was prepared, filed and generally handled by Roy J. Lester, Esq.  Exhibit BARM-5,

Krinsky Decl., at ¶ 5. Although Mr. Lester was the Jemals' general bankruptcy counsel in their chapter 7

proceeding, Jemal retained the Backenroth Firm to represent him in certain matters in the bankruptcy

case, namely: (i) the defense of three adversary proceedings objecting to Jemal's discharge from certain

liabilities unrelated to the SSJ Loan (Adv. Proc. Nos. 12-01256, 12-01260, 12-01261); (ii) the defense of

a motion to compel abandonment of property; and (iii) a motion to lift stay.  Krinsky Decl., at ¶ 2.  Mr.

Krinsky appeared for Jemal on these matters.  Krinsky Decl., at ¶ 2.  Mr. Frankel did not perform any

legal services in connection with the Jemal bankruptcy.  Frankel Decl., at ¶ 5; Krinsky Decl., at ¶ 3.  The

matters for which the Backenroth Firm was retained are concluded, leaving Jemal with at least $8 million

of nondischargeable debt.  Exhibit BARM-19, Order Denying Discharge; Exhibit BARM-20, Stipulation and Order of Settlement; Exhibit BARM-21, Stipulation and Order of Settlement; Krinsky Decl., at ¶ 2.

On November 2, 2012, an order of discharge was entered in Jemal's bankruptcy case.  As such, he received a discharge from personal liability on all debts, except those debts determined to be non-dischargeable.[13]  Exhibit BARM-18, Discharge Order; Exhibit BARM-19, Order Granting Summary Judgment; Exhibit BARM-20, Stipulation of Settlement; Exhibit BARM-21, Stipulation of Settlement.  BARM did not seek to except from discharge the obligation of Jemal arising out of the guaranty of the SSJ Loan.  Tr. 55:18-25.  Therefore, any liability of Jemal under his guaranty of the SSJ Loan was discharged, and the bankruptcy case was closed on May 27, 2013.  Exhibit BARM-22, Final Decree.

E.  Southwest/SSJ Action

In 2013, after Jemal received his discharge, BARM commenced the Southwest/SSJ Action against Southwest Securities, Inc., Leighton Stallones (an officer of Southwest Securities, Inc.), and SSJ Development (collectively, the "Southwest Defendants").  Belsky Decl., at ¶ 11; Blander Supp. Aff., at ¶ 1. BARM's complaint in the Southwest/SSJ Action alleges that material misrepresentations and omissions by the Southwest Defendants induced Pratt to make the SSJ Loan.  Id.  Jemal was not named as a defendant.  Id., at ¶ 3.  Although SSJ Development was named and served, it has not appeared in the Southwest/SSJ Action.  Id., at ¶ 1.

In 2014, Southwest Securities served Jemal with subpoenas commanding him to appear for deposition as a non-party witness and to produce documents.  Exhibit BARM-23, Subpoena; Exhibit BARM-24, Supplemental Subpoena; Blander Supp. Aff., at ¶ 5; Krinsky Decl., at ¶ 2(c).  Jemal produced documents and was examined on June 17, 2014.  Krinsky Decl., at ¶ 2(c).  The Backenroth Firm's representation of Jemal on this matter was limited to the subpoena, document production and deposition and such representation was concluded on June 17, 2014.  Krinsky Decl., at ¶ 2(c).  Mr. Frankel did not

---

[13] A discharge under section 727(a) of the Bankruptcy Code does not relieve a debtor from personal liability on all debts. A discharge affects only those debts that are dischargeable. Whether a debt is dischargeable depends, *inter alia*, on whether the debt is excepted from discharge. See 11 U.S.C. § 727(a) and § 523(a) (listing 19 exceptions to discharge).

perform any legal services for Jemal in connection with the Southwest/SSJ Action.  Frankel Decl., at ¶ 5; Krinsky Decl., at ¶ 3.

Shortly after his appointment as the interim trustee, Mr. Pergament appeared in the Southwest/SSJ Action in support of the Southwest Defendants' application for a stay of the Southwest/SSJ Action (BARM-7, Blander Aff., at ¶ 10), contending that the estate has an interest in that action.  The New York State Supreme Court would not permit Mr. Pergament to participate absent formal intervention.  Id.  Mr. Pergament has not sought to intervene in the Southwest/SSJ Action.  Id., at ¶ 12.  Rather, he and BARM reached a written agreement, i.e., the April 27 letter agreement, pursuant to which BARM agreed not to distribute any proceeds recovered in the Southwest/SSJ Action before providing Mr. Pergament with forty-five days' notice of such distribution, and Mr. Pergament agreed that he would not file his own action, would not intervene in the Southwest/SSJ Action, would not seek to remove the Southwest/SSJ Action and would consent to BARM's continued litigation of the Southwest Action.  Exhibit BARM-13.

F.   Mr. Frankel

Mr. Frankel has been licensed to practice law in the State of New York since 1984 and in the State of Ohio since 1983.  Exhibit BARM-6, Frankel Decl., at ¶ 2.  He has been admitted to practice before the United States District Courts for the Eastern and Southern Districts of New York since 1984 and the United States District Court for the Northern District of New York since 1990.  Id.  Since 1985, Mr. Frankel has concentrated his practice in bankruptcy law and creditor's rights law.  Id.  He resides in the Eastern District of New York and his office is located in the Southern District of New York.  Id.  He has previously served as an elected permanent trustee in a chapter 7 case in the Eastern District of New York (In re Colden Garden Condominium, Inc., No. 1-08-42333-ess).

The Backenroth Firm no longer represents Jemal in the Southwest/SSJ Action, and the Backenroth Firm has not represented SSJ Development.  Frankel Decl., at ¶ 6; Krinsky Decl., at ¶ 2.  Mr. Frankel has never personally performed legal services for Jemal or any entity associated with him. Although Mr. Frankel may have seen Jemal in the Backenroth Firm's offices and may have greeted him,

they have never been introduced to each other and have never had a substantive conversation with each other.  Frankel Decl., at ¶5.

Prior to the U.S. Trustee's filing of the Election Report on May 1, 2015, Mr. Frankel had no knowledge that Mr. Pergament had alleged that he was disqualified from acting as permanent trustee, if so elected in this case.  Frankel Decl., at ¶ 4.  Neither the U.S. Trustee nor Mr. Pergament discussed these issues with him at any time. Id.  He attended the 341 Meeting at which the trustee election was conducted. Id.  No one at the election raised any question about his eligibility to serve as trustee.  Id.  The Backenroth Firm does not represent Barkany, anyone who has filed a proof of claim in this case, the Barkany entities identified in the Judgment (Interim Trustee Exhibit B) attached to the BARM Group's proofs of claim filed in this bankruptcy case or any of the Southwest Defendants, and has no claims against any of those persons.  Id., at ¶ 11.

Mr. Frankel affirms that the Backenroth Firm's prior representation of Jemal would not influence any investigation that he may undertake as the trustee concerning the circumstances of Pratt's loan to SSJ Development, Jemal's guarantee of that loan and Pratt's purported assignment of the loan to BARM and that, if appropriate, he would have no reluctance to examine Jemal concerning such matters, whether directly or through retained counsel.  Id., at ¶ 10.  He consents to doing everything necessary and appropriate to investigate whether the estate has a claim regarding Southwest Securities, Inc.  Id.  Mr. Frankel and the Backenroth Firm have made the following commitments to minimize the possibility of any potential or actual conflict of interest during Mr. Frankel's service as chapter 7 trustee, should he be elected and confirmed: (i) they will not accept representation of Jemal, SSJ Development, anyone who has filed a proof of claim in this case, the Barkany entities identified in the judgment [Interim Trustee Exhibit B] attached to the BARM Group's proofs of claim or any of the Southwest Defendants during the time that Mr. Frankel serves as chapter 7 trustee in this case; (ii) Mr. Frankel will be the only member of the Backenroth Firm working on estate matters; (iii) he will not discuss or share documents concerning estate matters with other members of the Backenroth Firm; and (iv) he will retain an outside law firm to

serve as general counsel to the trustee. Id., at ¶ 12. Mr. Pergament did not cross-examine Mr. Frankel at the July 13 Evidentiary Hearing.

V.    DISCUSSION

    A.    Who May Serve As Trustee

Section 321 of the Bankruptcy Code provides, in pertinent part, that a person may serve as trustee in a case under the Bankruptcy Code only if such person is (1) an individual who is competent to perform the duties of trustee and (2) in a case under chapter 7, 12, or 13, of the Bankruptcy Code, resides or has an office in the judicial district within which the case is pending or in any judicial district adjacent to such district. 11 U.S.C. § 321(a).

Mr. Frankel meets these qualifications in that he is admitted to the practice of law and has practiced bankruptcy law since 1985, and has previously served as a chapter 7 trustee in another case in this judicial district. Mr. Frankel resides in this judicial district and has an office in the judicial district adjacent to this district. Thus, whether Mr. Frankel is eligible to be elected as permanent chapter 7 trustee in this case depends upon (i) whether a permanent chapter 7 trustee is required to be a disinterested person, and free of any disabling conflict and, if so, (ii) whether Mr. Frankel satisfies such requirement.

    B.    Disinterested Person

A trustee is generally required to be a disinterested person. Section 701(a) of the Bankruptcy Code, which governs the appointment of an interim chapter 7 trustee, 11 U.S.C. § 701(a), and section 1104(b) of the Bankruptcy Code, which governs the election of a chapter 11 trustee, 11 U.S.C. § 1104(b), both require that the trustee appointed or elected pursuant to those provisions be a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code. Section 101(14) of the Bankruptcy Code provides that the term "disinterested person" means a person that:

> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

Section 701 of the Bankruptcy Code provides for the appointment of an interim trustee, i.e., "[p]romptly after the order for relief under this chapter, the United States trustee shall appoint one disinterested person . . . to serve as interim trustee in the case." 11 U.S.C. § 701(a).

In contrast, section 702 of the Bankruptcy Code, which sets forth the requirements for the election of a chapter 7 trustee, does not expressly require that the permanent chapter 7 trustee be a disinterested person. The relevant section simply provides, in pertinent part, that "[a]t the meeting of creditors held under § 341 of this title, creditors may elect one person to serve as trustee in the case if election of a trustee is requested by creditors." 11 U.S.C. § 702(b). In re Jack Greenberg, Inc., 189 B.R. 906, 909 (Bankr. E.D. Pa. 1995) (stating that "[f]rom the plain language of the statute, it appears that Congress required that the appointed interim trustee be disinterested but failed to articulate a similar requirement with respect to the elected [c]hapter 7 trustee"). The BARM Group contends that the contrast between the two sections is revealing because "the draftsman thought that creditors who elect a trustee do not need this protection because of their free decision to vote in the election." In re Colony Press, Inc., 83 B.R. 862, 867 n. 3 (Bankr. D. Mass. 1988). [ECF. No. 230].

Such an interpretation, however, is not in harmony with section 702(d) of the Bankruptcy Code which provides that "[i]f a trustee is not elected under this section, then the interim trustee shall serve as trustee in the case." 11 U.S.C. § 702(d). Hence, the contradiction - an interim chapter 7 trustee who automatically becomes the permanent trustee in the absence of an election under section 702(d) is required to be a disinterested person, but no such requirement exists for an elected trustee.

It is illogical that the interim trustee as the estate representative must be disinterested, but a trustee may be elected to serve as the estate representative despite a disabling conflict of interest. Not surprisingly, the few cases that have addressed this very issue have concluded that a candidate must be disinterested in order to be elected as the permanent trustee because the trustee, as a fiduciary of the estate, must not have any disabling conflict. In re Lupo, No. 09-21945-JNF, 2011 Bankr. LEXIS 454, at

*10 (Bankr. D. Mass. Feb. 2, 2011); <u>Jack Greenberg, Inc.</u>, 189 B.R. at 911; <u>In re Nanvarok Seven, Inc.</u>, 148 B.R. 86, 87 (Bankr. D.D.C. 1992). Although the court in <u>Nanvarok Seven</u> relied upon the pre-Bankruptcy Code case of <u>In re Mayflower Hat Co.</u>, 65 F.2d 330, 331 (2d Cir. 1933), to hold that "the choice of the unsecured creditors should be recognized and upheld by the court unless the selection was contrary to law, or it appears that the trustee so elected has interests that conflict with those of the general creditor of the estate," it noted that trustee elections require close scrutiny to determine whether the election candidate "will be able to handle the duties of a trustee in an independent and impartial manner consistent with his fiduciary duty to treat all parties fairly". <u>Nanvarok Seven, Inc.</u>, 148 B.R. at 87-88. Where an election candidate also represents creditors whose claims against the estate are disputed and where the election candidate received a prepetition payment from the debtor that may be a preference, such candidate could not be elected as the permanent trustee. <u>Id</u>.

Similarly, the <u>Jack Greenberg, Inc.</u> court reasoned that where the plain meaning of legislation conflicts with another section of the Bankruptcy Code, or with an important state or federal interest, it is proper to examine pre-Bankruptcy Code practice for interpretative assistance as to congressional intent. <u>Jack Greenberg, Inc.</u>, 189 B.R. at 909. The court first looked to section 323 of the Bankruptcy Code which provides that "[t]he trustee in a case under this title is a representative of the estate", and "[i]n that capacity the trustee is a fiduciary and intended to be independent. Allowing a person with a conflict of interest to serve as trustee in a case runs counter to this fundamental precept that a trustee is a fiduciary." <u>Id.</u>, 189 B.R. at 910 (internal citations omitted). The court then noted under the Bankruptcy Act of 1898, an elected Chapter VII trustee was required to be free of any adverse interest to the estate and that such requirement is still presumed to be valid notwithstanding the absence of such language in section 702 of the Bankruptcy Code. <u>Id</u>. (citing <u>Nanvarok Seven, Inc.</u>, 148 B.R. at 87). Thus, the <u>Jack Greenberg, Inc.</u> court concluded that a permanent chapter 7 trustee, regardless of how he attained the position, cannot serve with a disabling conflict of interest and the absence of the disinterested requirement in section 702 is not inconsistent with its conclusion. <u>Id</u>., at 911.

Requiring an election candidate to be a disinterested person is consistent not only with section 323 and pre-Bankruptcy Code practice, but also with the requirement under section 327(a) of the Bankruptcy Code that professionals retained to assist in the administration of the bankruptcy estate must be disinterested.  See, e.g., In re AroChem Corp., 176 F.3d 610 (2d Cir. 1999); In re Southampton Brick and Tile, LLC, No. 11-75928, 2012 Bankr. LEXIS 4810 (Bankr. E.D.N.Y. Oct. 12, 2012); In re Ampal-American Israel Corp., 534 B.R. 569 (Bankr. S.D.N.Y. 2015); In re Project Orange Assocs., LLC, 431 B.R. 363 (Bankr. S.D.N.Y. 2010).  Section 327(a) permits the trustee to employ only professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties."  11 U.S.C. § 327(a).  This assures that professionals working on behalf of the estate provide undivided loyalty and untainted advice and assistance in accordance with their fiduciary duties to the estate.  Southampton Brick and Tile, LLC, supra, at *4.  Indeed, section 327(a) requires the retained professional to not only be disinterested at the time of appointment but also to continually disclose any connections with the debtor, creditors or any party in interest that may render it no longer disinterested or cause it to have an interest adverse to the bankruptcy estate.  In re Granite Partners, L.P., 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).  "Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free."  Id.

"In construing the disinterestedness standard, bankruptcy courts have held trustees and their retained professionals to a rigorous standard."  In re MF Global Inc., 464 B.R. 594, 600-01 (Bankr. S.D.N.Y. 2011) (citing In re Allegheny Int'l, Inc., 117 B.R. 171, 178-79 (W.D. Pa. 1990)); In re Realty Assocs. Sec. Corp., 56 F. Supp. 1007, 1007 (E.D.N.Y. 1944) ("The trustee must be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters").  The purpose of the disinterestedness requirement is to avoid any associations or connections, whether direct or indirect, between potential employees of the trustee and the estate, which could introduce conflicting loyalties into the bankruptcy case.  Allegheny Int'l, Inc., 117 B.R. 171, 179 (W.D. Pa. 1990) (citing In re Philadelphia Athletic Club, Inc., 20 B.R. 328, 333 (E.D. Pa. 1982).  Adherence to the disinterestedness

requirement avoids not only actual conflicts of interests, but the appearance of conflicts, as well. Id. Actual and potential conflicts of interests between attorneys employed by the estate and the estate itself can impact the integrity of the bankruptcy system as a whole. In re Angelika Films 57th, Inc., 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998) (citing In re Spanjer Bros., Inc., 191 B.R. 738, 753 (Bankr. N.D. Ill. 1996)).

Given the stringent requirement that a trustee and his or her retained professionals be disinterested and free of any disabling conflict during the pendency of a case, it is axiomatic that an election candidate must also be disinterested and free of any disabling conflict in order to be appointed as the permanent chapter 7 trustee. To permit a person with an interest adverse to the estate to serve as the elected trustee is incompatible with those sections of the Bankruptcy Code that require professionals retained by the estate to be free of any adverse interest not only at the time of appointment or retention but also throughout the bankruptcy case. The question therefore naturally arises: what purpose could possibly be served by appointing an election candidate who is not disinterested as the permanent trustee? Such appointment would unquestionably lead to further litigation. The election candidate – now permanent trustee - would be the subject of a motion seeking immediate removal either because of an interest materially adverse to the bankruptcy estate or a disabling conflict. In re Lupo, supra, at *10.

It is therefore reasonable to conclude, as did the courts in Nanvorek Seven, Inc., Jack Greenberg, Inc. and Lupo, that requiring the election candidate to be a disinterested person as set forth in section 101(14) is not inconsistent with section 702 and other applicable provisions of the Bankruptcy Code. To the contrary, such construction is consistent, and brings all provisions of the Bankruptcy Code regarding the retention of professionals in a bankruptcy case in harmony. Accordingly, the Court finds that a permanent trustee elected under section 702 of the Bankruptcy Code must be a disinterested person and free of any disabling conflict of interest.

    C.   Whether Mr. Frankel Is A Disinterested Person

As noted above, Mr. Pergament, as interim trustee, challenged the eligibility of Mr. Frankel to serve as permanent trustee in this bankruptcy case. Mr. Pergament argues that Mr. Frankel is precluded

from serving as permanent trustee because he has an interest materially adverse to the bankruptcy estate and is therefore not a "disinterested person" as that term is defined in section 101(14)(C) of the Bankruptcy Code.[14]

Mr. Pergament, as the party challenging the eligibility of the election candidate, bears the burden of proof with regard to the facts supporting ineligibility. In re AFI Holding, Inc., 355 B.R. 139, 148 (B.A.P. 9th Cir. 2006). See Evans v. Artek Sys. Corp., 715 F.2d 788, 794 (2d Cir. 1983) (moving party bears "heavy burden" of proving facts required for disqualification); Southampton Brick and Tile, LLC, supra, at *13. Courts determine whether an adverse interest exists on a case-by-case basis with due consideration given to the totality of the circumstances. AroChem Corp., 176 F.3d at 623; In re Belmonte, 524 B.R. 17, 27 (Bankr. E.D.N.Y. 2015). In the Second Circuit, a professional will be deemed to "hold or represent an interest adverse to the estate" when such professional (1) possesses or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) possesses a predisposition under circumstances that render such a bias against the estate. AroChem Corp., 176 F.3d at 623 (citing In re Roberts, 46 B.R. 815 (Bankr. D. Utah 1985), aff'd in relevant part and rev'd and remanded in part on other grounds, 75 B.R. 402 (D. Utah 1987)). "[T]he Second Circuit has held that the mere fact that an attorney represented an adverse interest *in the past* does not alone created a disabling *conflict in the present*." Southampton Brick & Tile, supra, at *17 (citing AroChem Corp., 176 F.3d at 624) (emphasis in original).

Within this framework, the Court will now address the basis for Mr. Pergament's claim, and then explain why the evidence demonstrates, and why the Court finds, that Mr. Frankel is a disinterested person.

Mr. Pergament contends that Mr. Frankel is not disinterested because (i) the Backenroth Firm represented Jemal in his personal bankruptcy case and in a nonparty deposition in the Southwest/SSJ

---

[14] The parties do not dispute that section 101(14)(A) and (B) are not applicable to the issue to be decided by the Court.

Action, and (ii) the bankruptcy estate may bring an action against Jemal to recover on his personal guaranty of the SSJ Loan despite his having received a bankruptcy discharge.  In support of his position, Mr. Pergament first asserts that Pratt is the alter ego of Barkany.  Next, he argues that the assignment of the SSJ Loan by Pratt to BARM was made without consideration and the bankruptcy estate, therefore, may seek to avoid the assignment by Pratt of its rights under the SSJ Loan.  Continuing, he then asserts that the estate would move to reopen Jemal's personal bankruptcy case and commence an action to revoke of his discharge on account of fraud.[15]  In Mr. Pergament's view, even though Mr. Frankel did not personally represent Jemal in his personal bankruptcy case or in the deposition, Mr. Frankel's appointment as permanent trustee creates an appearance of impropriety because of a perceived reluctance to bring an action against Jemal, a former client of his firm.  Mr. Pergament further contends that had the creditors voting at the 341 Meeting known of the potential conflict, they would not have voted for Mr. Frankel.

First, the Court observes that none of the creditors who voted for Mr. Frankel at the 341 Meeting have come forward and withdrawn their support for Mr. Frankel because of the Backenroth Firm's prior representation of Jemal. To the contrary, the creditors that cast votes in favor of Mr. Frankel, i.e., the BARM Group and the Canadian Northern Creditors, take issue with Mr. Pergament's claim that Mr. Frankel is not disinterested and therefore ineligible to serve as permanent trustee in this case.  Second, Mr. Pergament has not presented any evidence to support a finding that Mr. Frankel or the Backenroth Firm possesses or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute between the bankruptcy estate and Jemal. Third, the path to the estate's assertion of a claim against Jemal is fraught with obstacles, none of which the interim trustee has demonstrated can be readily overcome. Any interest that would be materially

---

[15]  This contention, i.e., pursuing a claim against Jemal, reopening his bankruptcy and seeking revocation of his discharge was raised by Mr. Pergament for the first time in oral argument at the July 13 Evidentiary Hearing.  It was not made in in his initial response [ECF No. 206] to the pending motions to resolve the election controversy nor in the supplemental response [ECF No. 229] that he filed at the Court's request.

adverse to the bankruptcy estate or give rise to a disabling conflict on the part of Mr. Frankel based on the SSJ Loan and the Backenroth Firm's representation of Jemal in his bankruptcy case and at a lone third-party deposition in the Southwest/SSJ Action is remote.

As noted above, the SSJ Loan was not made by Barkany individually. Rather, it was a loan by Pratt to SSJ Development. Pratt subsequently assigned the loan to BARM. For the estate to have a claim against SSJ Development and against Jemal on his personal guaranty of the SSJ Loan, the estate would first have to avoid Pratt's assignment of the SSJ Loan to BARM. This would involve not just avoiding the Amended Assignment and Assumption of Loan Contract executed by Barkany and Pratt, but also the assignment executed by Mrs. Schreiber. No action has been brought on behalf of the estate to avoid Pratt's assignment of the SSJ Loan to BARM.[16] Even if the estate were successful in an action to avoid both assignments of the SSJ Loan to BARM, there is an additional step that the estate must take and prevail on before it could obtain any rights with respect to the SSJ Loan. That step involves a further litigation in which the estate must prove that Pratt and Barkany should be deemed one and the same, e.g., that Pratt is Barkany's alter ego and the corporate form disregarded; this, notwithstanding Mrs. Schrieber's co-ownership of Pratt and the testimony of Mr. Schreiber at the July 13 Evidentiary Hearing regarding, *inter alia*, his day to day control of Pratt and fifty percent contribution of the funds toward the SSJ Loan.

The estate would have to prevail on all of the litigation outlined above so as to be the owner of the SSJ Loan and thus position itself to seek recovery on Jemal's personal guaranty. According to Mr. Pergament, it is the estate's claim against Jemal, and not against SSJ Development, that renders Mr. Frankel disinterested as Jemal is a former client of Mr. Frankel's law firm. This, then, brings us to the next impediment to collection on the Jemal personal guaranty – the estate would have to successfully

---

[16] While Mr. Pergament, as interim trustee on behalf of the estate, commenced an adversary proceeding against BARM on August 18, 2015, that adversary proceeding relates to a $100,000 transfer that BARM allegedly received from Alan Gerson and Bruce Montague & Partners. It is not an action to avoid the assignment of the SSJ Loan by Pratt to BARM.

move under section 350(b) of the Bankruptcy Code to reopen Jemal's bankruptcy case. Should Jemal's bankruptcy case be reopened, the estate would then have to separately move to revoke Jemal's discharge. That measure is necessary because the estate cannot enforce a claim against Jemal under his guaranty as a result of his having received a bankruptcy discharge on November 2, 2012. 11 U.S.C. § 524(a)(2).[17]

Mr. Pergament asserts that grounds may exist to revoke Jemal's bankruptcy discharge for fraud. When a debtor obtains a discharge through fraud, a discharge previously granted may be revoked. 11 U.S.C. § 727(d)(1). Pursuant to section 727(e)(1) of the Bankruptcy Code, a creditor may request a revocation of a discharge under section 727(d)(1) of the Bankruptcy Code within one year after such discharge is granted. 11 U.S.C. § 727(e)(1). Assuming that Jemal did engage in some fraudulent conduct with respect to the SSJ Loan, the one year period within which a request for revocation may be made under section 727(d)(1) has elapsed and the ability of the bankruptcy estate to seek a revocation of Jemal's discharge pursuant to section 727(e)(1) has expired. Even if the one year period had not yet expired, the Court notes that BARM, which has been actively pursuing collection of the SSJ Loan in the Southwest/SSJ Action, elected not to pursue SSJ Development because it is defunct, Blander Supp. Aff., at ¶ 4, nor has BARM named Jemal as a defendant in the Southwest/SSJ Action or sought to have Jemal's liability under the guaranty excepted from discharge, Blander Supp. Aff., at ¶ 13. As such, it appears that BARM questioned the collectability of the SSJ Loan from SSJ Development or Jemal.

The myriad of litigation that the estate must commence and prevail on in order to (i) unwind the Pratt assignment of the SSJ Loan to BARM, (ii) establish that Barkany so dominated Pratt so as to disregard the corporate entity under an alter ego theory or such other theory of consolidation, (iii) reopen Jemal's bankruptcy case and seek to revoke his discharge, and (iv) collect under the Jemal guaranty, is challenging. It is speculative, at best, whether the estate may one day own the SSJ Loan and have a claim against Jemal under his personal guaranty. Based on the record and the evidence adduced at the July 13

---

[17] Section 524(a)(2) provides, in relevant part, that "[a] discharge in a case under this title – operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor…." 11 U.S.C. § 524(a)(2).

Evidentiary Hearing, Mr. Pergament has not met his burden of proof in establishing that Mr. Frankel holds or represents an interest adverse to the estate by reason of the Backenroth Firm's prior representation of Jemal.

Furthermore, there is nothing in the record to support any claim that Mr. Frankel holds or possesses a predisposition under circumstances that render a bias against the estate. In the Southwest/SSJ Action, the Backenroth Firm's representation of Jemal was limited to representing him in the nonparty deposition taken by Southwest Securities, and the Backenroth Firm's representation of Jemal in the Southwest/SSJ Action has concluded. More importantly, the bankruptcy estate does not currently have a claim in the Southwest/SSJ Action as it is not the owner of the SSJ Loan. By stipulation, Mr. Pergament and BARM agreed that the estate would not seek to intervene in the Southwest/SSJ Action. Although the stipulation reserved any rights the estate may have in the Southwest/SSJ Action, Mr. Pergament elected to have BARM alone pursue the SSJ Loan, and BARM agreed to provide notice to the estate of any recovery on the SSJ Loan. As noted above, the estate has not commenced an action to avoid the Pratt assignment of the SSJ Loan to BARM. To do so would be inconsistent with the terms of the stipulation whereby BARM, with the consent of Mr. Pergament, is taking the laboring oar in the Southwest/SSJ Action, and the estate agreed to not intervene in the Southwest/SSJ Action. Mr. Pergament's argument that Mr. Frankel, if elected, is predisposed not to pursue Jemal to the detriment of the estate is unpersuasive as the estate currently does not hold a claim against Jemal and if Mr. Frankel were to be elected as permanent trustee he would be bound by the stipulation that Mr. Pergament entered into with BARM. Therefore, the claim that Mr. Frankel is predisposed to not pursue Jemal is at the present time a non-issue. Even if the estate is able to surmount the obstacles addressed above and become the holder of the Jemal guaranty, it is unlikely that Mr. Frankel would suffer from a predisposition that would result in a bias against the estate. Mr. Frankel has agreed, and would be so required, to retain a law firm other than the Backenroth Firm as counsel to assist him in the administration of this bankruptcy estate. Accordingly, Mr. Pergament has also not met his burden of proof in establishing that Mr. Frankel holds or represents an interest adverse to the estate because he is predisposed to not pursuing any estate claim against Jemal.

In sum, after having carefully considering the testimony and the documentary evidence introduced at the July 13 Evidentiary hearing, and the extensive arguments of counsel, the Court is firmly convinced that it is far too tenuous to suggest on the record before the Court that Mr. Frankel has any interest adverse to the estate or its creditors, much less a materially adverse interest, or any disabling conflict.  See Southampton Brick and Tile, LLC, supra, at *11 (finding that an attorney was not disqualified merely because it is possible to conceive set of circumstances under which interests of attorney and estate might clash or because of merely hypothetical conflict of interest).

<u>CONCLUSION</u>

For the reasons set forth above, the Court hereby finds that (i) a permanent trustee elected under 11 U.S.C. § 702 must be a disinterested person and (ii) at least insofar as the parties and issues appear in this case at the present time, Mr. Frankel is disinterested and is free of any disabling conflict of interest. Accordingly, the objection to the eligibility of Mr. Frankel as an election candidate on the ground that he is not disinterested is overruled.

So ordered.



**Dated: December 29, 2015**
**Central Islip, New York**

**Louis A. Scarcella**
**United States Bankruptcy Judge**